UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
LAS VEGAS DIVISION


HOWARD ACKERMAN,                  )  CASE NO:  2:11-CV-883-GMN-PAL
                                  )
            Plaintiff,            )            CIVIL
                                  )
     vs.                          )       Las Vegas, Nevada
                                  )
STATE OF NEVADA                   )    Friday, February 10, 2012
DEPARTMENT OF CORRECTIONS,        )
ET AL.,                           )    (10:21 a.m. to 1:16 p.m.)
                                  )
            Defendants.           )
_____)


MOTION HEARING

BEFORE THE HONORABLE GLORIA M. NAVARRO,
UNITED STATES DISTRICT JUDGE


Appearances:              See next page

Court Recorder:           Araceli Bareng

Courtroom Administrator: Melissa Jaime

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988







Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>

Plaintiff:               JACOB L. HAFTER, ESQ.
                          MICHAEL K. NAETHE, ESQ.
                          Law Ofc. of Jacob Hafter & Associates
                          7201 W. Lake Mead Blvd., Suite 210
                          Las Vegas, NV 89128

Defendants:            WILLIAM J. GEDDES, ESQ.
                          DAWN ROSENBERG, ESQ.
                          State of Nevada
                          Office of the Attorney General
                          100 N. Carson Street
                          Carson City, NV 89701

1      **Las Vegas, Nevada; Friday, February 10, 2012; 10:21 a.m.**

2                          **Call to Order**

3          **THE COURT:**  Thank you.  You may be seated.

4          **MR. SPEAKER:**  Thank you.

5          **THE CLERK:**  *Howard Ackerman versus Department of*

6  *Corrections*, 11 Civil 883 GMN PAL.  This is the time set for a

7  status conference.

8          Counsel, please note your appearances.

9          **MR. HAFTER:**  Good morning, your Honor.  Jacob Hafter

10 and Michael Naethe for Plaintiff, Howard Ackerman.

11         **THE COURT:**  Good morning, Mr. Hafter.  And I don't

12 think I've met Mr. Naethe yet.  Good morning, Mr. Naethe.

13         **MR. NAETHE:**  Good morning, your Honor.

14         **MR. GEDDES:**  Good morning, your Honor.  Will Geddes

15 for the NDOC Defendants and I'm joined here by my client, Dawn

16 Rosenberg.

17         **THE COURT:**  Good morning, Ms. Rosenberg.  Thank you

18 for joining us.  And good morning again, Mr. Geddes.

19         **MR. GEDDES:**  Thank you.

20         **THE COURT:**  Let me try to make some sense of this

21 because there's quite a bit that's been filed back and forth,

22 and I tried to organize it somewhat and I ended up having to

23 color code it so that I could actually keep track of it.

24         So go ahead and keep your indexes.  I'll kind of go

25 through my notes and tell you which motions I think are before

4

1  me that I can rule on, which ones we'll need to wait for, and

2  which ones I'll refer to Judge Leen, and tell me if I leave

3  anything out.

4       Okay.  Starting off, obviously this is a continuation

5  of the Plaintiff's first TRO motion which is on the docket as

6  Number 4, and I'm going to refer to these numbers by their

7  docket, the motions and the responses and such by the docket

8  number.  It just makes it easier for my Clerk when she does the

9  minutes to keep track of what's what as well.

10       So, you know go ahead and copy those down if you want

11  to, but if you don't want to, you could just ignore those.  But

12  -- so the Motion TRO Number 4 was heard back in June and that's

13  when you-all entered into an agreement to wait six months and

14  see if there couldn't be a resolution.

15       And then we came back and continued it -- we lifted

16  the stay at that point, continued it for another 30 days.  I

17  think that was in January and we had a hearing then.

18       Then we set the status conference for a week or so

19  ago, and there were still many different things being filed

20  back and forth so we put it off until today to see if we could

21  get as many late motions as possible that we could rule on

22  today.

23       And so Motion Number 4, which is the initial motion

24  for the TRO, essentially is pretty moot at this point because

25  it really only addressed the initial unimplemented, initial

1    common fare menu, and there's been changes to that now.

2         So I'm going to go ahead and deny without prejudice

3    the motion for the TRO inasmuch as it only applies really to

4    the initial implementation of the common fare menu that was

5    never actually implemented.

6         Now, since then we've had quite a few other motions

7    filed, and one of the -- my law Clerk called it, "here's a fun

8    fact."  One of the fun facts is that since the January 3rd

9    hearing, the parties have filed over 1,000 pages of documents.

10   Thank you very much.  Okay.

11        So, going now we've got the emergency Motion Number

12   31, which was actually three motions in one.  First of all

13   there's a motion for preliminary injunction; there's also a

14   motion for class -- rather for reconsideration of class

15   certification because that was denied without prejudice; and

16   then there's also a motion for an order to show cause or for an

17   evidentiary hearing as to whether the status quo was maintained

18   or not when Mr. Ackerman was moved to Lovelock, and whether or

19   not there's a kosher menu being offered there.

20        So those three motions are actually -- are contained

21   in Motion 31.  And I would just ask in the future if you could

22   file them separately.  It's just a lot easier for us to keep

23   track of them because we use a computer system and it links

24   things by numbers, and so it just causes a lot more trouble if

25   you file numerous motions in one.  But I think we've got it

1    straightened out.

2            There is also an amended complaint that was filed,

3    and that was Number 29.  And in response to that amended

4    complaint, the Defendants did file a motion to dismiss which is

5    Number 33.

6            And inasmuch as the motion to dismiss raised quite a

7    few issues and then the response was filed on February 8th, if

8    I was going to go ahead and grant the motion to dismiss today,

9    I would go ahead and do so.  And I'm sure that the Defendant

10   would waive their right to file the reply.

11           But having reviewed the response to the motion to

12   dismiss, I do think that there is some issues there that -- or

13   some arguments that were raised that require me to look a

14   little bit further into this.  And so I do appreciate if the

15   Defendants go ahead and reply.  I think the deadline is

16   February 18th.  You can let me know if that's doable or not.

17           **MR. GEDDES:**  Thank you, your Honor, we will do that.

18           **THE COURT:**  Is -- would February 18th be enough time

19   for you?

20           **MR. GEDDES:**  Yes, your Honor.

21           **THE COURT:**  Okay.

22           **MR. GEDDES:**  Thank you.

23           **THE COURT:**  Then I prefer to wait until after

24   February 18th to receive that reply --

25           **MR. GEDDES:**  Thank you.

1      **THE COURT:**  -- before I actually rule on the motion

2   to dismiss.  So that was my intention is that I would rule on

3   the motion to dismiss today if I was going to be granting it,

4   but I'm not going to be granting it today.  Rather I'd like to

5   hear from the Defendant.

6           So moving on then, there's also two other motions

7   that were filed that were referred to Judge Leen.  There's

8   Number 40 which is a motion for order to show cause prohibiting

9   the Alif (phonetic) institution -- institute, sorry -- from

10  contacting Chaplain Friedman.

11          And then there's also Plaintiff's motion to strike

12  Chaplain Friedman's declaration.

13          And the responses to those are due February 24th.  So

14  those aren't ripe and fully briefed yet.

15          I'm going to go ahead and refer to Judge Leen to

16  address those motions.  So specifically, Judge Leen will

17  address the motion to show cause Number 40, and part of Number

18  52, which is the motion to strike the declaration that -- that

19  was actually kind of a two parter in that the motion applies to

20  both Number 40, the motion to show cause, and also to the

21  motion for PI.

22          So I will address part of that motion to strike, the

23  part of the motion that applies to today's preliminary

24  injunction hearing.  And so it's part of Number 52 which is the

25  motion to strike, will be addressed by me as it relates to

1  Motion Number 31 which is the motion for PI.

2          The other part of Motion Number 52 which applies to

3  the motion to show cause Number 40, we'll allow Judge Leen to

4  go ahead and rule on that.

5          Now in this case, I have to say, because this is a

6  preliminary injunction hearing and because it's going to be

7  decided by the Court and not by a jury, there's a, you know, a

8  different -- a different way of looking at this particular

9  declaration.

10          First of all, I could just deny it without adequate

11  basis because we're not in the discovery stage.  So some of the

12  issues that were raised as to whether or not there was a proper

13  disclosure or a timely disclosure doesn't really apply so much

14  in the sense that we haven't actually had a discovery

15  scheduling order, so there really isn't a deadline yet for the

16  disclosure of an expert.  So a deadline hasn't been set, let

17  alone expired.  So really that basis doesn't apply.

18          The issue of whether or not Chaplain Friedman is

19  experienced enough or whether he is certified to be providing

20  opinions that he's provided in the declaration, that's

21  something that I'm going to go ahead and consider.  And so I am

22  going to deny that motion to strike because I am going to

23  consider the declaration of Chaplain Friedman, but I am going

24  to decide what weight to give it.  And that's in light of the

25  objections that have been raised by the Plaintiff, so it really

1   is, in essence, it's not a matter of the admissibility of it.

2   I'm going to admit the declaration, but I am going to look at

3   it with a close eye as to whether or not how much weight should

4   be given to it.

5         So looking in more detail now for the group, I'll

6   call them the trio.  The trio of Plaintiff's motions which is

7   Number 31.  And that again is the motion for preliminary

8   injunction, motion for class certification, and motion for an

9   order to show cause and for an evidentiary hearing.

10         Starting off first, there was a motion to file a

11   surreply that was filed by the Defendants.  That's Number 61,

12   and that was filed last night at 3:00 a.m.

13         And then Plaintiffs quickly got themselves together

14   and they filed a response this morning at 8:35 a.m.  And I did

15   briefly get a chance to very quickly look at that, and -- but

16   my sense is that I think the most appropriate thing to do in

17   this regard so that we can go forward is I'm going to go ahead

18   and grant the motion to file the surreply.  I'm going to

19   consider its contents.

20         First of all, the things that I look at is whether or

21   not the surreply is outside the scope of the reply.  In other

22   words, if you're bringing up something completely new and

23   different, then I would not grant it.

24         But really it's a response, so it was brought up in

25   the Plaintiff's reply.  So I think it is appropriate to go

1   ahead and allow the surreply to be filed.

2          And also there's nothing really redundant in there.

3   So I'm going to go ahead and allow it to be filed, but again,

4   I'm going to take -- let you-all give me some argument today,

5   so you can still address all the information that's provided in

6   that surreply.  But I am going to be granting Number 61, the

7   motion to file the surreply.

8          So getting a little bit into the meat of this, some

9   of the questions that I have that I highlighted in blue here,

10  I've got a list of the Plaintiff's sources for kosher

11  authority, and that essentially begins with the Torah and the

12  first five books of the Bible, the Talmud, the Code of Jewish

13  Law, Judge Rule's (phonetic)  order from 2005 in the *Green*

14  case.  Also there's the declaration from Rabbi Grossman

15  (phonetic).

16         And looking through it, I don't see that the

17  Plaintiff necessarily specifies what does constitute formal

18  authority, and I know in the latest filing -- but you do refer

19  to the rabbinic counsel, but you also referred to the

20  California prison system and their certification of kosher that

21  is the -- at -- and I'm not sure exactly how to say, is at a

22  different standard than the standard that is used in Nevada.

23         But when you're referring to the standard, I'm not

24  sure if that's a legal standard or a religious standard, or

25  just a common law standard.  So maybe when it's your turn to

1    speak if you could kind of address that a little bit to clarify

2    it for me, I would appreciate it if you can.

3            Let's see.  There were -- one of the exhibits to

4    Defendant's response to the motion for preliminary injunction,

5    it was Docket Number 47-6, Exhibit D, is the common fare menus

6    kosher certification, which I'm presuming certifies that menu

7    as kosher.  And I would appreciate if you could elucidate on

8    that a little bit and give me a better idea of how that exactly

9    works.

10           Let's see.  We've got a -- the legal standard is

11   pretty clear, and I think both parties agree with the *Winter*

12   (phonetic) case.  And that the four things that I'm looking at

13   is the likelihood of success on the merits, the likelihood of

14   irreparable harm in the absence of the preliminary relief, the

15   balance of the equities, and whether the injunction is in the

16   public interest.

17           However, there wasn't very much information provided

18   to me on the standard of proof, and so I want to make sure that

19   both parties agree here, because the Defendants are arguing

20   that the required showing -- or the clear showing is that the

21   evidence be extraordinary.  Extraordinary evidence is what the

22   Defendant is stating.

23           And I think the only -- the only authority that was

24   provided for that was an unpublished decision by a Magistrate

25   Judge in California.  So, the Plaintiff didn't touch on that

1    issue, and there's so many other issues that I, you know,

2    I'm -- I guess I'm surprised and -- that you were able to touch

3    on as many issues as you could in such a short period of time.

4           But if you do have a position as to whether or not

5    you agree that extraordinary evidence is required for the clear

6    showing, or whether there's some other different standard of

7    proof, you know, please let me know what your position is on

8    that.

9           Also the Plaintiff didn't really address the *Walmart*

10   case, and that's, you know -- well, actually I'm going to go --

11   we'll get to that eventually for the class certification.

12          But it's important to note that the Ninth Circuit has

13   held that there are serious questions going to the merits and

14   the hardship balance that tips sharply towards the Plaintiff,

15   and that can support an issuance of an injunction.

16          I have to tell you, at this point, I don't think that

17   the likelihood of success on the merits is clear.  But there is

18   that other balancing test that we do, and in that sense, I

19   think maybe perhaps it is appropriate to at least look very

20   closely at granting that preliminary injunction.  And I'll tell

21   you a little bit later what I'm thinking.

22          I really want to get an idea of whether or not the

23   Plaintiff had any objection to or any recommendation or request

24   for a preliminary injunction that was perhaps a little less

25   severe, a little less broad than what is currently being

1    requested.

2          And I think that dovetails probably into the class

3    action certification issue.

4          My understanding, and again, I'm going to give you a

5    chance to clarify, but my understanding is that this common

6    fare menu is not meant to apply only to the inmates that

7    declare themselves to, you know, require a kosher menu, but

8    rather it applies to every individuals that have special

9    dietary needs.  Diabetics, high blood pressure.  Just every

10   individuals.  I'm not sure.

11         But if that is the case, then could there be an order

12   that would enjoin the implementation as to the kosher inmates

13   but not as to all the other inmates that have special dietary

14   needs, so that at least some of the cost savings can be

15   realized by the prison.

16         Because there is quite a bit of funding here that

17   could be saved, and that is definitely in the public's interest

18   to try to save as much money as possible and still comply with

19   the laws and the requirements.

20         So maybe there is some wiggle room.  I don't know.  I

21   think what I remember seeing is, and I don't remember which

22   party provided me the number or if it's even accurate, but

23   about a hundred or so inmates are actually currently included

24   in the kosher diet, which to me seems like that leaves a whole

25   lot of other individuals who have other dietary needs that

 1    perhaps could still be served, and then the state could sill

 2    save some money that way.

 3          But you-all let me know if you think that's -- if I'm

 4    -- I try really hard not to just come up with a resolution that

 5    you-all didn't ask me to enter into.  I try to streamline it,

 6    but that just occurred to me, and I wanted to throw that out

 7    there to see if that was something that maybe we could do

 8    because I know this has gotten a little bit more adversarial

 9    probably than it needs to be.

10          Now let's see.  The other thing was looking at --

11    there are some issues with the, you know, the legal term

12    substantial burden.  And I realize the Defense -- the

13    Defendant's position is that it's not a substantial burden

14    because it is kosher.

15          Well, okay, I understand that, but if it's not

16    kosher, I think there is case law out there that is pretty

17    clear that it would be a substantial burden to the inmate if

18    this diet is in fact not kosher.

19          And my understanding is that the issue is not whether

20    the individual items on the menu are kosher or whether the, you

21    know, the lunch and the breakfast taken as a whole is kosher,

22    but whether the preparation is going to be done in a kosher

23    manner, whether the facilities that are used have been

24    kosherized (phonetic), for lack of a better word.  But whether

25    everything is done properly, how often it's going to be

1   checked, and so forth.

2          So that's my understanding.  That it's not a matter

3   of whether or not the food itself is kosher, but -- or whether

4   the plan of having, you know, milk with fruit versus, you know,

5   sausage and milk even on the same thing, that whether or not

6   that is -- is being offered, that that's not the -- the foods

7   themselves are not the issue.  It's the preparation area, and I

8   think we talked about last time about whether it's going to be

9   -- have a lock on it and in a separate location and things like

10  that.

11         But it seems like perhaps there could be a way to

12  allow the prison to implement the common fare program and --

13  but just limit it as to either Mr. Ackerman, since he's the

14  only Plaintiff at this point, or to all of a hundred or so

15  inmates that are declared kosher if they qualify for a class

16  action status and if they have to first exhaust their grievance

17  procedure, and whether or not they need to opt in or opt out.

18         That's something that if you want to mention to me

19  what your thoughts are on that, I'd like to hear those.

20         Okay, Rabbi Bronchtain.  Is he here?

21         **MR. HAFTER:**  Your Honor, he's not.  We had a --

22         **THE COURT:**  Okay.  That's all right.  I was just

23  going to sympathize with him for the position that he's been

24  placed in because it sounds like he's kind of getting the phone

25  calls and getting grief from all different positions, and it

1   doesn't appear this is a situation of his making, and so I was

2   going to thank him for all the assistance that he provided.

3          But -- to tell him that I appreciate it and I'm

4   empathetic, and I'm sorry that he's put in this position.  But

5   if he's not here that's okay.

6          I understand that there -- okay.  So Rabbi Bronchtain

7   at this point is now refusing to sign the contract to provide

8   the ongoing services with the Department of Corrections for

9   Nevada.

10          And that may or may not be his own choice or, you

11   know, he has other individuals that he has to respond to, and

12   his constituency for lack of a better word, congregation,

13   whatnot.

14          But the Defense is saying that perhaps there is

15   another Rabbi from California who likewise does certifications

16   for the prison systems in California who is available and is

17   willing, and would be able to contract with the department, and

18   come and fulfill both services.

19          So I know this is short notice, and you probably have

20   a lot of questions as I do, but -- so I'm wondering if the

21   Plaintiff still has a concern with this particular Rabbi, other

22   than the fact that obviously you've stated that the standard is

23   different in California than it is in Nevada.  And again I'm

24   not sure if that's a legal standard or just a community

25   standard.

1          But the individual himself, I'd like to know whether

2  he would have any problem with him, his certification, his

3  authority, his ability and so forth, or if it's just a matter

4  of him being able to apply two different standards.

5          We tell that to the juries all the time when they

6  come in here.  If they've served previously in state court, we

7  explain to them, well, sometimes we have -- the law applies

8  differently in federal court than state court.  Can you set

9  that aside and apply a different standard?

10          So, let me know if you have any other concerns with

11  -- I'm just calling him the California Rabbi because I forgot

12  his name already, but you know who I'm talking about.

13          Okay.  Let's see, what else do I want to ask here?

14  Oh, Moskowitz.  That's what it was.

15          Oh, Ackerman's last non-kosher purchases as late as

16  March of 2011.  I understand he's been making some non-kosher

17  purchases and the Plaintiffs are saying, well, he may not have

18  known that the purchases he were making were non-kosher.  And

19  we don't know if he's even eating it or if he's providing it to

20  other individuals.  Whether or not that's against the

21  regulations, you know, inmates do that and so forth.

22          And so Plaintiff is asking me not to give too much

23  weight to the fact that Mr. Ackerman has made these purchases.

24  So it sounds like you are not denying that he made these

25  purchases, but just rather how much weight I should give to

1    that.  You're asking me to kind of not give it as much weight

2    as the Defendants are requesting.

3          Let's see.  There was an argument that the Plaintiff

4    brought as to whether or not the Department of Corrections Greg

5    Cox had followed the proper procedure in implementing the

6    common fare menu, and whether or not that violated state law.

7    And the way that that regulation was implemented, whether or

8    not it needed to be approved or not.  And it hasn't been

9    approved by the board or -- whether or not that particular

10   statute -- the Nevada statute, whether it does apply and

11   authorize Mr. Cox to go ahead and implement that menu

12   unilaterally or not.

13         And I think that that argument is a valid concern,

14   but it's not properly raised in a reply.  And it probably would

15   be best to raise it in a motion to amend the complaint, because

16   my understanding is that what you would like to do is go ahead

17   and amend the complaint to include Mr. Cox, and then raise the

18   issue of whether or not that common fare menu was properly

19   authorized and put into effect.

20         Okay.  Then the other part of Number 31 which is the

21   motion to reconsider the show cause, as to whether or not

22   Mr. Ackerman, who has been moved to Lovelock, whether or not

23   that was done in retaliatory fashion, whether there was --

24   well, I guess that I shouldn't say retaliatory fashion because

25   that's another cause of action, but whether or not there was a

1   violation of the Court's original order which was really -- my

2   original order of staying the case for six months was at the

3   request of the parties, because I remember that you-all stood

4   up and kind of conferred, and I gave you a little bit of time

5   to see if you could come to some kind of agreement.

6         And then you told me that what you had agreed on was

7   a six month stay where the status quo would remain the same,

8   and you would try to see if you could resolve something before

9   the implementation of the plan and see if there was some

10  resolution that could be reached.

11        So, my concern was that Mr. Ackerman was moved, and I

12  think that that concern has been alleviated by the

13  documentation provided in the Sealey (phonetic) declaration

14  that does pretty much document -- well, it's well documented

15  that -- and justified that the reason for his move is something

16  that was within the purview of the department to go ahead and

17  move Mr. Ackerman, if that is a concern, for his safety and the

18  safety of others.  That's certainly something the department

19  can do.

20        I think the real issue here though is where he was

21  moved to and whether or not he was moved to a location that

22  does provide kosher meals or not.  And I understand that

23  Mr. Ackerman did try early on to provide an affidavit saying,

24  now I'm in Lovelock and I'm not receiving kosher meals anymore.

25  And that's a valid concern if in fact he's not receiving kosher

1   meals.

2          The problem I have is that he failed to produce any

3   evidence or anything other than just his own declaration which

4   really only contained his opinion and if this Court issued an

5   injunction for every case where someone just files an affidavit

6   with their opinion, you know, we'd be doing injunctions every

7   day all day long.  So, you know, the standard -- you all are

8   very familiar with what the standard is and we do need to have

9   more information than just his opinion that the food that he's

10  being provided at Lovelock is not kosher but if it's not, that

11  is a problem.  If it is kosher, it's not a problem but if it's

12  not kosher and he was moved there, that's a problem.

13          Let's see.  So as far as the part of Number 31, the

14  motion to reconsider -- or rather the motion to show cause, I'm

15  going to be denying that because there's not information at

16  this point to determine whether or not there was a -- well, the

17  Plaintiff hasn't met its burden to show me that there was a

18  failure to comply with the Court's order to provide the status

19  quo and that Mr. Ackerman was moved for the purposes of denying

20  him the kosher meals that he is fighting to retain.

21          Now, the other -- the third part of the motion to

22  reconsider -- or third part of Motion 31 is the motion to

23  reconsider certifying the class and many valid points are

24  brought by both parties.  My concern is how this would look.

25  In essence, there does need to be an exhaustion of

1    administrative remedies or there does need to be a grievance

2    process, whether or not these individuals would be opting in or

3    opting out, whether or not they could be represented in this

4    group by Mr. Hafter, whether we would be having another --

5    would Mr. Hafter be a lead counsel?  Would we have two co-lead

6    counsels?  Would we have another counsel?

7          I mean, Defendant really brought up some really valid

8    points about all those individuals but I think even if there is

9    animosity among them, sometimes a common cause can bring people

10   together and that's not a reason to deny a motion to certify

11   class just because not everyone in the class gets along.  I

12   mean, if they all have the same concerns and if they all agree

13   that they all qualify and opt in or don't opt out and frankly I

14   just didn't have enough time to look at which one of the two

15   methods we would use in this particular situation.  That's

16   concerning to me.

17         As far as the preliminary injunction, I'm leaning

18   towards denying the motion in essence as it applies to all

19   other individuals that -- whose needs would be met by this

20   diet, the people who have the other dietary concerns, medical

21   concerns, whatever they may be, if their concerns can be met by

22   this diet.  My question really is would the preliminary

23   injunction only apply as to Mr. Ackerman or to all the kosher

24   inmates and of course the questioned to me, well, so how do you

25   decide who is and who isn't?  The same way you've always

1    decided who is and who isn't a kosher inmate.  Whatever the

2    process is that you use now can still consistently be used to

3    determine whether someone does qualify or doesn't qualify,

4    whether -- I normally -- I am familiar with how you determine

5    now whether someone is or isn't, whether they've converted,

6    whether it's a new prisoner who just came in but whatever that

7    process is could be used.

8            So this was essentially Plaintiff's motion.  So I'm

9    going to go ahead and allow Plaintiffs to argue first and we'll

10   hear from the Defendant and then I'll let Plaintiff have the

11   last word.  So Mr. Hafter.  Now, I'm going to be quiet and you

12   talk and I'll take notes.

13           **MR. HAFTER:**  Thank you, your Honor, a lot of

14   information there.  First and foremost as a preliminary matter,

15   I want to say that we have a lot of the same questions you have

16   because personally -- and I'm going to take a step out here --

17   I'm shocked at the behavior of Defendants in the way that

18   they've managed the litigation in this case.  To file, for

19   example, issue -- a whole support from a brand new rabbi

20   addressing the common fare menu at 3:00 o'clock in the morning

21   before we have this hearing is not the spirit of what I think

22   this Court intended by giving us 30 days' notice and, you know,

23   we didn't find out anything substantive about the common fare

24   menu and the kashruth thereof until Tuesday or Monday night

25   when they dumped 200-and-something pages on us in an opposition

1    to the motion for preliminary injunction.

2             And so of course we don't have experts or anything

3    about this because how are we supposed to get that?  And

4    moreover, many of the accusations about Mr. Ackerman, because

5    he's incarcerated and I can't just pick up the phone and talk

6    to him or I can't have him come to my office and sign an

7    affidavit, I can't get you evidence on -- in this manner and I

8    hope that the Court is sympathetic of those issues.  That being

9    said, let me address --

10           **THE COURT:**  Well, if he has you on his list as his

11   attorney, you should be able to call him and coordinate that so

12   that he can call you back.

13           **MR. HAFTER:**  He can call us but we have a very

14   difficult time calling him.

15           **THE COURT:**  Okay.

16           **MR. HAFTER:**  Almost -- it's never worked.

17           **THE COURT:**  Okay.  Well, you should be able to call

18   and leave a message for them to call you back at a certain

19   time.

20           **MR. HAFTER:**  We've tried and luckily he calls in a --

21           **THE COURT:**  Okay.

22           **MR. HAFTER:**  -- very frequent amount but it's

23   difficult, your Honor, and what should happen and what does

24   happen are two different things and that's one thing that I'm

25   hoping you understand throughout all these arguments.  What

1    should happen in prisons is not what happens in prisons and

2    I've got to say, I've never done prison law before but this is

3    an eye-opening situation.  I am shocked and dismayed at what's

4    gone on here.  The calls and letters that we receive from

5    inmates across the department are highly supportive of this

6    case, highly supportive of the work that this office has done.

7    They're watching us, the inmates are and we get stories from

8    inmates all over that things that should be happening are not

9    happening but that's not before this Court right now.

10          So I'd like to focus on the questions that you

11   listed.  Let me talk a little bit about sources of kashruth and

12   understanding kashruth.  First of all in Judaism, there's three

13   different primary groups.  There's the Reform, Conservative and

14   Orthodox.  The Reform outwardly admit -- and we provided a

15   brief reference to it this morning -- that halakha or Jewish

16   law has no real place in Judaism.  Judaism in the modern world

17   is more about culture and tradition and the like.  The Orthodox

18   believe strict compliance with the law, back to the oral of the

19   Torah or the Bible and it's strict compliance and within each

20   -- and the Conservative somewhere in the middle.  They believe

21   in Jewish law but they believe it could be evolved and changed

22   based on rabbinic guidance.

23          There's a reason why -- oh, excuse me.  Within each

24   sect are different schools.  There are different synagogues.

25   There are different groups.  One thing I want you to notice

1   today is the support that we have throughout the community.  We

2   have rabbis here that are not just Chabad.  They're from

3   various other Orthodox institutions, Kollel and the like.  You

4   can generally tell by their beard length the different sects

5   but the fact of the matter is the Orthodox rabbis when it comes

6   to kashruth work as a whole and that's why generally there's

7   not one rabbi who gives a certification and we need to make a

8   very clear difference between certification and saying

9   something is a supervision.

10          Certification is generally done by a group of rabbis

11  across the spectrum in the Orthodox community because they want

12  to make sure that they're complying with the letter of the law

13  which is what the Va'ad in Greater Seattle is.  The Va'ad

14  HaRabonim is a collection of various rabbis from different

15  Orthodox communities that come together to create -- to ensure

16  that the standards used in that community comply with the

17  letter of the law under the Torah and the related authorities

18  therefrom.

19          It doesn't matter whether you're from Seattle or Las

20  Vegas or Reno or Israel or Russia, kashruth is kashruth, kosher

21  is kosher and that's the real point that we need this Court to

22  understand is that there's a certain --

23          **THE COURT:**  But you're telling us that in California

24  there is a different standard than they use there.  So is that

25  just a different standard --

1          **MR. HAFTER:**  What --

2          **THE COURT:**  -- within the religion, not a legal

3    standard or a --

4          **MR. HAFTER:**  And if you're taking that from today's

5    opposition of the surreply, if I didn't use the exact words, I

6    beg your -- as I said in --

7          **THE COURT:**  Okay.

8          **MR. HAFTER:**  -- the first line, I beg your patience

9    on, you know, responding to something that was filed at 3:00 in

10   the morning.  What I was trying to suggest is for him to come

11   in from the California prisons and say -- because I am at the

12   California prisons so I could address the Nevada prisons -- for

13   that rabbi to do that is improper because the California system

14   -- the California policy within the prison -- the prison policy

15   is different than the common fare.  As I provided the policy to

16   this Court, the policy on Page 4 says that a -- every facility

17   where there's kosher meals served shall have a full-time

18   rabbinic supervision or supervision from an appropriate

19   chaplain.

20          That's what we've been suggesting this whole time is

21   the main defect in the problem with the common fare menu is you

22   have food that's being prepared at these prisons without the

23   ongoing, continual full-time supervision and they say, but

24   we're going to have random checks.  There's nothing random

25   about going to a prison.  You have to call ahead.  You have to

1    get permission.  You can't just show up and get in.  Even when

2    you show up, it takes time before you get in and so, you know,

3    who's to say they don't clean something up or prepare or have a

4    different standard when the rabbi comes and does his check and

5    moreover because of the nature of a prison, the rabbi's

6    authority to really be independent is hampered.  They don't

7    have the ability to say, this needs to be changed.  This needs

8    to be moved or the like like most supervising rabbis do in

9    normal commercial food preparation because of safety issues and

10   the like.

11          So we need to make sure that there is a system here

12   that ensures that from day to day there's supervision to make

13   -- that everything is going properly and that's the big issue.

14          **THE COURT:**  Well, won't this individual be contracted

15   with the Department of Prisons so they'll be a set standard --

16          **MR. HAFTER:**  Absolutely.

17          **THE COURT:**  -- in place as what the authority is --

18          **MR. HAFTER:**  Absolutely but they're offering to do

19   that, your Honor.

20          **THE COURT:**  -- and responsibility.

21          **MR. HAFTER:**  Sorry, I didn't mean to interrupt.

22   They're not offering to do that, your Honor.  They're not

23   offering to provide full-time supervision.  What they said is

24   this rabbi from California is available to come over for spot

25   checks.  You know, I think what they were trying to do is fill

1    Rabbi Bronchtain's spot with this rabbi and, you know, Rabbi

2    Bronchtain was only scheduled to come in four times a year and

3    that's not ongoing, continuous supervision and what I was

4    trying to say about the different standards is in the

5    California kosher food system, the policy is very clear.  At

6    all times they have that rabbinic supervision that's onsite.

7            So, you know, it's interesting that they're going to

8    use a rabbi from California, rely on California standards for

9    running kosher programs at a prison and yet they're not going

10   to adopt the most critical standard there is by having full-

11   time supervision.  The other issue that --

12           **THE COURT:**  Maybe I misunderstood.  So you're saying

13   the California standard is better --

14           **MR. HAFTER:**  Absolutely.

15           **THE COURT:**  -- because they have --

16           **MR. HAFTER:**  Absolutely but --

17           **THE COURT:**  -- okay.  I thought you were saying it

18   was worse.  Okay.

19           **MR. HAFTER:**  We have a problem with the rabbi, okay,

20   because that rabbi is not certifying the kosher program for

21   California as a whole.  That rabbi is not providing that

22   policy-making decision.  That rabbi is taking a set of policies

23   and standards and ensuring that they're implemented properly.

24   Those are two completely different issues and that's one thing

25   that we really need to stress for this Court is that, you know,

1   all the time -- we have restaurants all across the city here

2   and even these rabbis will go and kosher-ize a hotel here for a

3   special event but the people who supervise the food production

4   at the hotel for the event or at these -- are not rabbis with

5   extensive training and experience.  You know, they're people

6   that understand the laws of kashruth and are subject to the

7   authority of the lead organization and so they simply

8   supervise, do a little bit of interactions and report back and

9   ask for changes to be made.

10          But we're having a problem that they have not

11  produced anyone that's certified the common fare menu as

12  overall being kosher and, you know, you made a statement about

13  how Document 47-6, Exhibit D is their kosher certification of

14  the common fare menu.  It's not.  What they did is they

15  provided lists of individual ingredients that have a kosher

16  certification when they're closed in the package as it is.

17  However, as we suggested from the KSA, from the head of the

18  kashruth, the same one that they're providing this list from,

19  we didn't take a generic letter.  We took a very specific

20  letter and that rabbi urged this Court to recognize that not

21  only do you have to have kosher ingredients to make something

22  kosher, you have to have supervision, the proper utensils, the

23  proper segregation of different areas.  It's a process and

24  understanding and creating the policy for that process requires

25  the implementation of a certifying organization.  Now, I need a

 1   -- I want to make a comment about that which --

 2              **THE COURT:**  Now, that wouldn't be --

 3         **MR. HAFTER:**  -- was not in the pleadings.

 4              **THE COURT:**  I'm sorry.  Let me just interrupt before

 5   I forget.  Now, that wouldn't be required for all the other

 6   dietary needs that are met by this particular menu, right?

 7         **MR. HAFTER:**  No, your Honor.

 8              **THE COURT:**  Okay.

 9         **MR. HAFTER:**  No, your Honor, and quite honestly, we

10   had no problem limiting the preliminary injunction just to

11   inmates who are Jewish and getting the kosher food menu

12   currently.  We're fine with that.  That's -- the other inmates,

13   their -- that's not our battle.  This is solely expression of

14   free exercise of religion and that's where we're going to draw

15   the line for us.

16              What's interesting and I think it's a point that

17   needs to also be clarified is every community has their own

18   board of rabbis that does these supervision and oversight.

19   Seattle has.  California has a ton -- New York, Denver, the

20   like.  We have two.  We have several rabbis who go out all the

21   time and certify restaurants, hotels, grocery stores and the

22   food that's prepared there, all right, and what's amazing to me

23   is that in their zeal to implement a common fare menu which

24   they're claiming is kosher, they've disregarded these rabbis

25   that were here in this community.  They've shunned Nevada's

1    rabbis and said, no, we're going to go somewhere else.  The

2    funny part is the Department of Corrections in the 1990s used

3    Rabbi Harlig, the head of Chabad of Southern Nevada as their

4    expert in a case.  He came and testified in a matter.  They

5    know they're here.

6            Why -- and this Court has to ask.  Why are they in

7    such a rush to disregard the resources that we have in this

8    great state of Nevada?  I don't know but instead, they're going

9    and getting a rabbi who has a Reform training which means that

10   he, by his own philosophies, do not believe in the stringencies

11   of Jewish law and having him fill in for the place of a rabbi

12   who said, you know what, without a certifying organization, I

13   don't feel comfortable providing ongoing supervision or

14   inspections.  That's the point here.  We need a certifying

15   agency and because they don't have a certifying agency or group

16   of rabbis that have said that the common fare menu is kosher,

17   we have significant concerns as to the kashruth of the menu.

18           Now, arguing in the alternative, I want it to be

19   clear that we're not saying the common fare menu can't work.

20   What we're saying is right now based on the information that we

21   have, we don't believe that it will work because they don't

22   have the ongoing supervision because there are some other

23   concerns that were raised such as the fact that their common

24   fare menu just simply lists product descriptions.  It doesn't

25   say the brands that they're getting.  So they haven't even said

1 in their common fare menu, you know, we're going to give X

2 brand of this on this morning. What they did is they're going

3 to say, we're going to give cold cereal and then they provide a

4 separate list that -- of ingredients and they're hoping that we

5 make the leap that those ingredients are what will actually be

6 used in this case.

7 And what happens if an ingredient isn't available for

8 -- on a particular order? What happens -- I mean, these are

9 questions. What can you substitute it with? These are the

10 issues that why you need ongoing supervision in part and -- but

11 they haven't provided a certification from an -- from a

12 standard. So that gets us to our preliminary injunction. We

13 don't need to prove a summary judgment standard. Matter of

14 fact, you asked us about this and -- technology is wonderful.

15 I have Westlaw and I'd like to point the Court's attention --

16 and I'm going to mess this up -- to *Gonzales versus O Centro*

17 *Espirita Beneficente Uniao do Vegetal* -- sorry, Court Reporter

18 -- 546 U.S. 418. It's a 2006 case and it was cited by a Ninth

19 Circuit Court in *Thalheimer versus City of San Diego*, 645 F.3d

20 1109 and it --

21 **THE COURT:** That's 645 F.3d --

22 **MR. HAFTER:** F.3d 1109.

23 **THE COURT:** -- 1109, thank you.

24 **MR. HAFTER:** And in that case, the Ninth Circuit

25 Court of Appeals stated -- talking about the first is a -- they

1    say that the Supreme Court affirmed reasoning that the burden

2    of proof of the preliminary injunction phase tracks the burden

3    of proof at trial and therefore RFRA challenges should be

4    adjudicated in the same manner as constitutionally mandated

5    applications of the test including at the preliminary

6    injunction stage, id at 430.

7            The Court relied on its earlier decision in *Ashcroft*

8    *versus ACLU*, 542 U.S. 656, 2004 decision in which it affirmed a

9    preliminary injunction against enforcement of The Child Online

10   Protection Act on First Amendment grounds and then they talk

11   about the proof at the preliminary injunction stage from the

12   *Ashcroft* Court and they said in deciding whether to grant a

13   preliminary injunction, a district court must consider whether

14   plaintiffs have demonstrated that they are likely to prevail on

15   the merits.  It's not extraordinary proof.

16           It's a likelihood of success and so all we're

17   suggesting here is without the benefit of discovery, okay --

18   with limited information that was dumped on us four days ago,

19   we think we've raised substantial concerns as to the kashruth

20   of the common fare menu that would suggest that the

21   implementation for the Jewish inmates currently receiving

22   kosher food of that menu would be an undue burden on their free

23   exercise of religion.  I mean -- and if you look at the lengths

24   the Defendants have gone to ram this down --

25           THE COURT:  It's not undue burden.  It's substantial

1    burden is the test.

2            **MR. HAFTER:**  Correct, I'm sorry, your Honor.

3            **THE COURT:**  It's substantial burden.

4            **MR. HAFTER:**  If you --

5            **THE COURT:**  It's clearly in burden but when you're in

6    prison, you're going to be burdened and that's -- and the law,

7    you know, makes room for that.

8            **MR. HAFTER:**  Well, that's the point.

9            **THE COURT:**  Yeah.  And so the standard here, just to

10   be clear, is that no government shall impose a substantial

11   burden on the religious exercise of a person residing in or

12   confined to an institution even if that burden results from

13   rule of general applicability unless the government

14   demonstrates that the imposition of the burden on that person,

15   number one, is in furtherance of a compelling government

16   interest -- which here they have over a million-dollar savings.

17   So I think that's pretty compelling -- and is the least

18   restrictive means of furthering that compelling interest and so

19   that's the other thing that I'm looking at is whether it is the

20   least restrictive means or not.

21           **MR. HAFTER:**  Right and the interesting part is they

22   haven't worked with us to -- or worked -- you know, they

23   haven't shown that they've worked with anyone to show that

24   that's the least -- this common fare menu is the least

25   restrictive means.

1          I want to point this Court's attention to another

2     decision that was recently released January 11th, 2012.  It's a

3     California Third District Court of Appeals decision, *In Re:* --

4     here we go again -- *Margarito Jesus Garcia*, 202 Cal App 4th at

5     842.  This decision was released on January 11th, 2012 and in

6     that decision they were -- the Court was trying to determine

7     whether or not the California prisons can deny a Messianic Jew,

8     a Jew who the mainstream rabbis didn't say was Jewish -- if

9     they could deny them Jewish -- kosher food and the Court of

10    Appeals said "No" and in that decision they had a lengthy

11    analysis of this exact issue, substantial burden.

12          And I want cite to something.  They have the evidence

13    of the cost for California discussed in there and they said

14    that a regular diet -- first of all, they said at the time the

15    evidence was produced, there were 684 inmates who were

16    receiving kosher food in all of California's prisons and they

17    said that the regular diet costs $2.90 a day.  The vegetarian

18    option costs $2.62 a day.  The religious meat alternative diet

19    costs $3.20 a day and the kosher food costs $7.97 a day and

20    notwithstanding the Court of Appeals found that the added

21    expense of more than double, almost triple what the regular

22    meal costs was not the substantial burden for the government --

23          **THE COURT:**  You mean was not a compelling interest.

24          **MR. HAFTER:**  -- compelling interest -- excuse me,

25    your Honor.  And furthermore what they -- the other point that

1    I want to take -- I would like this Court to take from it

2    respectfully is how much is Nevada paying per day under the

3    common fare menu and the regular menu versus how much is Nevada

4    paying for the current kosher meal compared to California?  You

5    know, and obviously there are other prison systems all

6    throughout the country that are offering kosher diets, not

7    common fare diets, kosher diets.

8            This battle just occurred in Indianapolis in Indiana

9    not that long ago and in Indiana, same thing, kosher menu stuff

10   and they tried to raise costs and the district court there --

11   the federal court struck it down.  The point was that the added

12   cost of the kosher menu wasn't a reason to deny kosher food in

13   that case as well but they haven't shown that they've looked at

14   any other prisons to implement what they're doing for kosher

15   food.  They haven't shown what the cost per day for kosher food

16   is here, you know, and why there's such a huge discrepancy when

17   all they're doing is flying in meals.

18           **THE COURT:**  Okay.  In that case though, were they

19   looking at whether it was a substantial burden versus a

20   compelling government interest to provide a kosher menu at all

21   versus no menu or was it a situation like we have here because

22   they have a kosher menu?

23           **MR. HAFTER:**  No, this --

24           **THE COURT:**  The issue is they just want to try to

25   implement a more cost-effective kosher menu.  It's going from

1    Kosher A to Kosher B versus kosher or no kosher.

2          **MR. HAFTER:**  Right.  Well, we don't believe that the

3    common fare is kosher -- so period, underscored.  We've got to

4    draw the line there.  That's our position --

5          **THE COURT:**  Okay.

6          **MR. HAFTER:**  -- and we believe because in every

7    community across this world in order for commercially-produced

8    food to be certified kosher, you need a proper -- a rabbinic

9    authority which is generally a council of rabbis that certifies

10   it -- every community across the country, across the world and

11   so until we see that, it's not kosher but they were looking at

12   whether or not they had a -- they were looking at the burden on

13   the prisons in California with respect to adding the Messianic

14   Jews to this diet that was already more expensive.  So, I mean,

15   I think it is analogous.

16          What's interesting is we also provided an article to

17   this Court in the -- in our opposition this morning suggesting

18   that California is lining up if they're not already in

19   litigation on this same issue because they're facing budget

20   crisis and, you know, they're looking at alternatives or

21   they're denying prisoners the opportunity to get on the kosher

22   list.  So we understand Nevada's goal now.  It would have been

23   nice if they would have communicated it to us and had a

24   dialogue about these issues during the six months that was

25   intended to resolve this but they didn't but now this week we

1　understand it but we don't agree that that is -- overwhelms the

2　right for kosher food.

3　　　　　Now, getting back to some of the other questions --

4　　　　　THE COURT:　Can you give me that *In Re: Margarito*

5　case again because I think I wrote down -- I wrote down 202 Cal

6　App 4th 842 and I think that's the wrong cite.

7　　　　　MR. HAFTER:　202 Cal App 4th 842.

8　　　　　THE COURT:　Okay.　That is what I wrote down.　Okay.

9　　　　　MR. HAFTER:　I just pulled it up from Westlaw not

10　that long ago.　So we can get it to this Court.　We can file

11　the opinion if you want.

12　　　　　THE COURT:　That brings up *Mize-Kurzman versus Marin*

13　*Community College*.　I'll try again and see if I put it in

14　wrong.　Let me get the name and I'll just pull it up by name.

15　　　　　MR. HAFTER:　That's the way I found it, your Honor.

16　　　　　THE COURT:　It's *In Re: Margarito* --

17　　　　　MR. HAFTER:　Excuse me, your Honor.　Try 202 Cal App

18　4th 892.

19　　　　　THE COURT:　Ah, okay, 892.　Thank you.

20　　　　　MR. HAFTER:　Okay.　That --

21　　　　　THE COURT:　So now you know I'm really checking.

22　Okay.　Okay, so my understanding is what you really want and

23　what you think would really be legitimately kosher is if there

24　was a council of rabbis and you would prefer a Nevada council

25　of rabbis who could supervise the preparation area and the

1  actual preparation of and the materials -- not materials, the

2  items that are used 24/7?

3          **MR. HAFTER:**  Yes, your Honor.

4          **THE COURT:**  Okay.

5          **MR. HAFTER:**  Or to have the council of rabbis certify

6  that even without that ongoing, 24-hour supervision, it's

7  kosher.  We'll defer to a council of rabbis that's an Orthodox

8  council of rabbis.

9          **THE COURT:**  And so, for example, in this case we had

10  Chaplain Friedman and I -- you know, I'm -- and I apologize

11  that I don't know enough about this but it caused me to think

12  of, oh, like an Army chaplain, you know, a chaplain that's, you

13  know, kind of non-denominational in the sense that, you know,

14  he serves the religious needs of many different individuals as

15  opposed to just one particular congregation and one particular

16  religion.  So is that what Chaplain Friedman is like or is the

17  chaplain just lower than a rabbi in some sense?

18          **MR. HAFTER:**  No.  To give him credit as we have, he's

19  Jewish.  He has education on the laws of kashruth.  He provides

20  outreach to Jewish inmates.  He's Jewish for Jewish inmates.

21  The difference is he doesn't have the ordination of a rabbi and

22  so what happened was though is he's been one of these

23  supervisors, you know, front-line guys who are working under

24  the authority of, in this case, the Va'ad HaRabonim of Greater

25  Seattle or the Council of Rabbis from Greater Seattle and what

1  he did is he used a letter that they provided saying that he

2  has this knowledge and experience to supervise and he -- and

3  the key language in that letter was in -- I think it was

4  connection or with this board and he went out and sold himself

5  as an expert to Nevada but the board had no idea what he was

6  doing, didn't approve of what he was doing and so they wrote a

7  letter saying, wait a minute.  Not that we can't approve the

8  common fare menu but we're not involved in this.  We have no

9  idea what's going on and Rabbi -- excuse me -- and Mr. Friedman

10  doesn't have the authority to certify the common fare menu.

11          **THE COURT:**  So he has the authority to certify if he

12  runs it by them and they approve it but --

13          **MR. HAFTER:**  No, the --

14          **THE COURT:**  -- if you didn't run it by them, then he

15  can't?

16          **MR. HAFTER:**  -- the board will certify.

17          **THE COURT:**  Right.

18          **MR. HAFTER:**  Okay.  He would do -- once it's

19  certified, he would do the inspections.

20          **THE COURT:**  Okay.

21          **MR. HAFTER:**  He would be the liaison between the

22  board and the prison, in other words.

23          **THE COURT:**  So he's their agent but only with --

24  related to the authority provided to him --

25          **MR. HAFTER:**  Exactly.

1        **THE COURT:**  -- case by case?

2        **MR. HAFTER:**  Exactly.

3        **THE COURT:**  Okay.

4        **MR. HAFTER:**  And so because he's not an ordained

5    rabbi who sits on a board of other Orthodox rabbis that are

6    heterogeneous throughout the Orthodox community, he really

7    doesn't have any credence to make any issuances of authority

8    for certification and you ask, well, why is -- if he's

9    knowledgeable, why can't he supervise and it's because

10   preparation of food changes -- I mean, there's millions of

11   ingredients and things come up all the time that, you know,

12   rabbis scratch their head and they go to their rabbis on, you

13   know, and so the problem is he doesn't have the ability to make

14   the real decisions on halakha law if there's an issue that

15   comes up because he doesn't have the -- it's kind of like, as I

16   mentioned in the brief, a paralegal, you know, stepping in the

17   shoes of the Court.

18        And that's the problem that we have with the

19   California rabbi that they've now provided is he's Reform.  He

20   doesn't believe -- well, I don't know what he believes.  I've

21   never met the guy but Reform Judaism does not believe in the

22   role of halakha or Jewish law in the modern world.  So how

23   could he make decisions on Jewish law when he's presented with

24   them in this case if by his own training and ordination, his

25   movement doesn't believe in a role of halakha in the modern

1    world?  And I've just got to say as an aside, this is really

2    cool to be able to argue Jewish law in front of a civil Court

3    for me but -- a couple other issues addressing your concerns.

4              I want to talk about Ackerman's non-kosher purchases.

5    You stated that are we denying -- we're not denying the

6    purchases and there's two funerals in the community, your

7    Honor.  So they wanted to support the Court but --

8              **THE COURT:**  I appreciate you coming.  Thank you.

9              **MR. HAFTER:**  First of all, I've talked to

10   Mr. Ackerman limited occasions about his non-kosher purchases

11   primarily because of time and it's sometimes hard to have

12   conversations over the phone with counsel and this is still a

13   pro-bono case for me.  So flying up to Lovelock every chance I

14   need to, it's a bit difficult but I think it's telling that in

15   the pile of papers that they've filed in their opposition --

16   their motion to dismiss, there were grievances specifically

17   discussing the canteen's purchases, that Mr. Ackerman was

18   grieving the fact that items were listed as kosher which were

19   not kosher on the canteen list, that vice versa, items were

20   listed as not kosher that were kosher on the canteen list and,

21   you know, he would order things and then get substitutions.

22   You know, so there's no evidence that he ordered those even

23   though his account was burdened with those items, first of all.

24             Second of all, there's no evidence that he ate those

25   items.  We know that inmates use whatever they can for currency

1    and trade them and so, you know, to ding him because he has

2    non-kosher food that's hit his account I think is a large leap.

3    They tried this in Traver (phonetic) Greens' case actually.

4    Traver Greens called me this morning right -- because he knew

5    we were having this hearing and he said, you know, I've been

6    reading these and they tried that on my case and it's not fair

7    because I wasn't eating those.  I didn't order those.  Now, I

8    don't know whether or not Mr. Ackerman ordered them or not.  I

9    haven't been able to speak to him about that topic because

10   there's so many other things we've been addressing but even if

11   he did --

12        **THE COURT:**  Okay.  Well, the law does require a

13   genuine belief.  So, I mean, it's a valid defense for them to

14   raise it.

15        **MR. HAFTER:**  Absolutely.  But even if he did, the

16   last item was ordered February 24th of 2011.  In eleven months,

17   he hasn't ordered it, okay, and, you know, how long does he

18   have to go not eating kosher food to be deemed a proper kosher

19   plaintiff?  I mean, isn't the whole point of the prison system

20   in some respect, you know, rehabilitation?  If he's evolving in

21   his religious practices and he was not eating non-kosher for

22   several months before this case was even filed, you've got to

23   ask yourself, well, it's not like he ordered it last week and

24   so putting everything together, I would ask that he not be

25   dinged with that.

1          Similarly, the only other issue that they raised in

2     their class certification opposition was, well, he's had these

3     incidences with this other inmate, the enemy, so to say which

4     it's fascinating because there's absolutely no evidence

5     provided to this Court that such enemy exists.  There's nothing

6     provided in camera to reveal the identity of this person.

7     There is nothing provided in the record to provide the

8     identity.  They said that, oh, he conspired with somebody to

9     assault another Jewish inmate.  The fact of the matter is he

10    was cleared of those charges.  I've got some real

11    constitutional issues, your Honor, with them raising that here

12    to stop him from serving as certification of his class as a

13    lead plaintiff when he was cleared of those charges.

14          But notwithstanding as you said, this may actually

15    bring these people together and moreover there's no evidence

16    that this enemy would object and finally I don't think that

17    there is an ideal plaintiff in the entire prison population

18    that hasn't made one enemy.  I've never been in prison, thank

19    God, but I could imagine that they have to look out for

20    themselves every single day and it's not the best environment

21    and I don't think that we would be able to find that.

22          Ideally, I would like some time to look at the issue

23    of exhaustion with respect to opting and opting out.  I don't

24    think that that was raised by them and I think that's an

25    interesting question.  I would find it really difficult, your

1    Honor, to believe that if there's an issue of this caliber

2    that's this widespread and this applicable to every -- to such

3    a class -- I mean, this is an ideal class.

4              **THE COURT:**  Was it raised about a hundred inmates?

5    Is that --

6              **MR. HAFTER:**  I don't know.

7              **THE COURT:**  I don't remember who gave me that number.

8    Maybe it was --

9              **MR. HAFTER:**  It was in their motion.

10             **THE COURT:**  Okay.  Yeah.

11             **MR. HAFTER:**  And I don't remember the number, your

12   Honor.  And still, again, we still haven't had discovery, so I

13   don't know if that's true or not.

14             **THE COURT:**  Right.

15             **MR. HAFTER:**  But, I mean, I would find it hard to

16   believe that if you've met the burden to open the suit, survive

17   a motion to dismiss, under the Prison Litigation Reform Act,

18   that -- and it certifies as a class, because you meet the class

19   surrogate (phonetic), that -- you then have to brief every

20   single person that wants to join that class.  And I would like

21   to have the opportunity to look at that, because that's an

22   issue that you're going to consider.

23             But, in the alternative, we would like to ask that

24   the class be certified in such a manner where prisoners have

25   the ability to opt out.  These prisoners have already taken

1   substantial steps to request kosher food, to get on a kosher

2   food menu.  They have had to go through interviews and sign off

3   by rabbis and the like.  They've done a lot of work here.  And

4   to now ask them to opt into a suit to just simply preserve what

5   they fought so hard to get on I think is adding more work for

6   them and our firm than, you know, is really necessary under the

7   goals of both the Prison Litigation Reform Act and supporting

8   constitutional rights in this Court.

9           **THE COURT:**  Well, I didn't find any case law as to

10  whether or not it was an opt-in or an opt-out basis.  So, I

11  don't know if no Court has decided that question yet or if I

12  just didn't have enough time --

13          **MR. HAFTER:**  Your Honor, to give you --

14          **THE COURT:**  -- to look it up.

15          **MR. HAFTER:**  Without sounding suck-uppish, it's an

16  interesting academic question, and we had never thought about

17  it.  So, we'd like the ability to at least look at that.

18          **THE COURT:**  Okay.

19          **MR. HAFTER:**  We actually, on the ultra vires act

20  issue --

21          **THE COURT:**  Uh-huh.

22          **MR. HAFTER:**  -- we actually were planning on filing a

23  motion for leave to amend.  The problem was, was we were under

24  the assumption that you were going to also address or rule on

25  the motion to dismiss.  We didn't want to file a motion for

```
 1   leave to amend if you were going to dismiss it today.

 2          THE COURT:  Uh-huh.

 3          MR. HAFTER:  We're trying to preserve some

 4   efficiencies --

 5          THE COURT:  Yes.

 6          MR. HAFTER:  -- in this Court.

 7          THE COURT:  Yeah.

 8          MR. HAFTER:  Just a few more issues you raised.

 9          I want to talk about this retaliation.  And in some

10   respect my question is:  What proof would we have had to bring,

11   given the fact that I can't have Mr. Ackerman wrap up his food

12   and send it to a rabbi and say, "Is this kosher?"  You know, if

13   he's given meat that's in a saran wrap, obviously, the package

14   is open.  And as the defendants have said, "Well, no, in order

15   to make sure the common fare menu is kosher, we're never going

16   to give an inmate an open package of meat.  It's always going

17   to be sealed," they recognize it has to be sealed.  So, when

18   Mr. Ackerman is providing this Court an affidavit saying that

19   he received meat that was in saran wrap, you've already opened

20   the door to think that it's not kosher.

21          And that's why we didn't just say we wanted an order

22   to show cause.  We wanted an order to show cause or, in the

23   alternative, an evidentiary hearing.  Because we'd like to be

24   able to bring Mr. Ackerman on the stand in front of some

25   rabbinic expert, ask these questions, and then say, "Based on
```

```
 1    what you heard, Rabbi, you know, what do you think?"  I think
 2    that that's at least fair under the circumstances.
 3              The other point that I really want to make, and we
 4    didn't have the opportunity to raise this in the pleadings as
 5    well as I would like --
 6              THE COURT:  But that's not necessary if I'm going to
 7    be granting the preliminary injunction.
 8              MR. HAFTER:  Well, you --
 9              THE COURT:  Right?
10              MR. HAFTER:  You're right, your Honor.
11              The other issue, your Honor, that I'd like to address
12    is I do not think -- originally I did.  I'm a little bit more
13    cynical than most.  And originally when Howard was telling me
14    about what he was experiencing on a daily basis, I thought he
15    had a sympathetic ear and he was abusing that.  I first met
16    Howard in person January 18, 2011, when I went to Northern
17    Nevada Correctional Center.  They knew I was coming.  We had to
18    make an appointment time in advance.
19              THE COURT:  Well, I realize you have a Rule 11
20    requirement to not file something that you believe is
21    frivolous, so I am assuming that you do believe --
22              MR. HAFTER:  Well --
23              THE COURT:  -- that he does actually have --
24              MR. HAFTER:  Well, but the point I would make, your
25    Honor --
```

1      **THE COURT:**  -- a true and honest cause of action.

2      **MR. HAFTER:**  -- is it's not coincidence, in my mind

3  anymore, that all of his troubles started that morning that I

4  arrived.  They put a white supremacist in his jail -- in his

5  cell that morning with him.  All right?  And then all of these

6  charges and allegations started after that time period.

7      And I think, quite honestly, they were setting

8  themselves up to do whatever they were going to do because

9  Mr. Ackerman had contacted counsel and was willing out of --

10  and we spoke with numerous Jewish inmates, your Honor.

11  Mr. Ackerman was the only one that really had the chutzpah to

12  stand up and say, "I'll represent the class; I'll go against

13  the department in this case."  And that's why -- and we

14  screened them.  We said, "Do you keep kosher?"  "Yes."  "You do

15  the --" "Yes."  And, you know, and we did our homework.

16      And the same day he all of a sudden starts to have

17  problems?  You know, and then he has these trumped-up charges

18  that are dismissed?  And then they say, "Well, because you have

19  this secret enemy, which we're not going to disclose, we're

20  moving you to Lovelock."  I just think at some point we've got

21  to say, "Wait a minute; what's going on here?"  And that may be

22  ultimately on the charge of retaliation, a definitive issue of

23  this case, but I think there is enough there to at least ask

24  some questions or enter into an evidentiary hearing.

25      I think I have answered all of your questions, your

1   Honor.

2          **THE COURT:**  Okay.  Well, I don't think we need to

3   have an evidentiary hearing on the retaliation issue.  I think

4   that's something that you can, along with the other questions

5   that you had, you can get into in discovery with

6   interrogatories and requests for documents.

7          I'd like to hear from the defendant as to whether or

8   not a preliminary injunction should issue as to just

9   Mr. Ackerman or whether it would be all of the inmates who are

10  currently receiving a kosher meal and as they enroll into the

11  program would also be entitled to opt out of that --

12         **MR. GEDDES:**  Thank you, your Honor.

13         **THE COURT:**  -- common fare menu.  I really don't want

14  to enjoin the prison entirely from implementing this menu, if

15  possible.  You know, you'll do your own cost-benefit analysis,

16  I'm sure, whether it's worthwhile to implement it for just the

17  other individuals.  I don't know what your numbers are for the

18  other individuals that have dietary needs that this would meet.

19  So, let me know.

20         **MR. GEDDES:**  Thank you, your Honor.  Again, Will

21  Geddes for the defendants, coming from Carson City this

22  morning.  I'm a little tired.  Obviously, I had a late filing

23  last night, and I apologize if I'm a little slow today.

24         Your Honor, there were a lot of statements made, and

25  I want to ask -- answer the Court's first question most

1   directly up front --

2           **THE COURT:**  Uh-huh.

3           **MR. GEDDES:**  -- and then I think, in fairness to my

4   client, we need to round out this discussion with a fair

5   counterpoint.

6           I haven't thought about it, so I don't have a direct

7   answer to the question that you posed.  It's an interesting

8   question, and I will take it back to my client, the question

9   being whether or not there could be a partial potential

10  injunction for a limited number of inmates versus others.

11          But I have to say -- and I was first introduced into

12  inmate litigation for the Attorney General's office in 2005, so

13  I've seen a lot of issues; I've seen a lot of lawsuits; I've

14  defended a lot of lawsuits; dealt with a whole gamut of

15  constitutional law; done trials.  So, I'd like to think I have

16  some familiarity with inmate litigation, but I want to,

17  obviously, you know, profess the requisite humility.  So, I

18  just want to give that factual background.

19          One of the problems that I see -- and it will require

20  me to vet it.  The problem is RLUIPA is as close as you're

21  going to get to strict liability.  It is very, very hard to

22  defend against RLUIPA.  And, so, what happens is you will have

23  a bunch of inmates who say, "Did you hear the news?"  "What's

24  that"?  "The official Orthodox inmates get to get a kosher meal

25  of a higher variety, a more costly variety."  "Well, we haven't

1   been ordained, we haven't been recognized by Aleph, there is no

2   outside organization certifying us, we haven't been born a Jew,

3   we haven't been converted through the -- certain protocols to

4   be a Jew."

5          And I will not stand before this Court and say that

6   this is my legal conclusion, but I think an argument can be

7   made, one which we would have to defend, that it doesn't matter

8   if someone on the outside world recognizes you.  Someone could

9   argue that RLUIPA is so severe and onerous that if a person

10  were a Catholic on day one, a Muslim on day two, a Protestant

11  on day three, and on day four decided they not only wanted to

12  be Jewish, but a particular type of Jewish inmate, one could

13  argue that RLUIPA requires that recognition, notwithstanding

14  these outside protocols.

15         So, stated another way, someone could wake up on a

16  Wednesday and say, "You know what?  I had a dream last night,"

17  and they could be perfectly sincere.  I'm not being facetious

18  at all.

19         **THE COURT:**  I see where you're going, and I think I

20  already had brought this up, because it occurred to me as well,

21  you don't want an avalanche of inmates now all of a sudden

22  saying, "Well, we're kosher, too."  But my thought process was,

23  well, how do you make that decision now, and why wouldn't you

24  be able to just implement the same procedure that you use now

25  to determine who does and doesn't get a kosher menu?

1           **MR. GEDDES:**  Thank you, your Honor.

2           The procedure is very inmate favorable.  Now, when I

3    say "the procedure," I am not talking about an historical

4    procedure going back several years.  I am talking about a very

5    liberal policy that is currently in effect at NDOC.  And that

6    policy -- and it's reflected in ARV 14 -- says, "Look, Mr. or

7    Mrs. Inmate, you come to us; you say that you are religion X,

8    Y, or Z.  This is not the Spanish Inquisition.  We are not here

9    to get in -- we are not the religion police.  We are not here

10   to doubt you just because we want to doubt you.  We're not here

11   to doubt you because some organization hasn't certified you."

12   Instead, if there are articulable -- the same Terry stop

13   criminal procedures -- if there are articulable facts upon

14   which to base a reasonable suspicion that this person is not

15   sincere, then we will either reserve our right to go against it

16   later or deny you now.

17          In essence, the policy now is:  If we deny you, it

18   means we're willing to take you on in court.  And the challenge

19   with that is the prison may not have information up front, or

20   it may get a request from a religion, a brand new religion, the

21   religion of Hawaii, or the religion of Kentucky; just, "It's my

22   religion; it doesn't have to be a mainstream religion, and gosh

23   darn it, I require kosher meals."  How is the Nevada Department

24   of Corrections, then, to say, "Well, we've got one guy in

25   Lovelock who says this, and, you know, it's going to cost the

 1   State of Nevada, you know, $17,000" -- I'm just making up a

 2   number -- "to figure it out, to hire an expert." Does this

 3   seem like this is a substantial burden? And because RLUIPA is

 4   very -- has tension within itself, that the practice that is

 5   allegedly burdened doesn't have to be a mainstream practice,

 6   yet in the same statute it has to be a substantial burden. So,

 7   there is a tension there.

 8           The point being that the trends that we've seen --

 9   we've produced documents and evidence to this Court already in

10   our opposition to their motion for preliminary injunction, the

11   declaration of Deb Reed, and the exhibits attached thereto --

12   which is authenticated; it's proper evidence before this

13   Court -- that shows several years ago there were seven or so

14   inmates -- I may have my number off -- and now, in 2013, there

15   is going to be a projected number of over 500. The issue that

16   the NDOC thinks has happened is that there has been this

17   bandwagon effect. And that is the reason why it has driven

18   costs so high.

19           So, if this Court were to entertain a sort of

20   fashioned together injunction, we have every reason to believe,

21   and we believe we have already established that phenomenon in

22   the record, that there will be a jumping.

23           The other problem is, is if this Court were to say,

24   "No, no, that's fine; we sympathize with the NDOC; only those

25   who are certified by Aleph or by some outside organization or

1   who were born Jewish or who converted to Judaism" -- which can

2   be very difficult in prison -- "then we now face an equal

3   protection problem, a lawsuit in that regard."

4            Now, if the Court wants to issue the order, the

5   Court's going to --

6            **THE COURT:**  But you do now already anyway.

7            **MR. GEDDES:**  I'm sorry?

8            **THE COURT:**  But don't you already face that problem

9   now anyway?

10           **MR. GEDDES:**  An equal protection -- well, not in --

11   not -- we get -- the NDOC receives suits all of the time for

12   violations, a variety, including equal protection.  But in the

13   context of that, we are providing a standardized, uniform

14   kosher meal, which we believe is kosher, to all of the inmates.

15   There isn't the differential treatment aspect of an equal

16   protection claim.

17           And, so, -- so, we -- I guess at this point all I'm

18   saying is, is I -- I'm not sure if that's a workable solution,

19   but I'd certainly take that back to my clients.  Absolutely.

20           One of the things that I'd like to address, if I may,

21   your Honor, the points that were raised by opposing counsel,

22   and then to the degree that I -- I've written notes where

23   they -- I don't believe they were responsive to other questions

24   you asked, I'd like to answer those.

25           **THE COURT:**  Please.

1          **MR. GEDDES:**  I would like to say at the outset -- and

2   I actually started to draft a brief a couple days ago

3   requesting a status conference with this Court for purposes of

4   avoiding wasteful practices.  And I thought better of it, and I

5   thought, I've got so much to do in this case, I'll just put

6   that aside.

7          I hear rhetoric from the other side that they're

8   shocked that we're doing document dumps, that we -- we're

9   engaging in unfair practice, and that Mr. Ackerman is -- has a

10  very strong reputation and he's being unfairly -- he's put in

11  an unfair light.  I would like to say I cannot remember a

12  time -- and I may stand corrected by the record, and if

13  somebody went back to all of the filings I've done since I've

14  been barred, they may find that I'm wrong -- so I'm saying I

15  cannot remember a time when I have been called or my client has

16  been called a liar, or that we lied, so many times.  And it's

17  so offensive to me.

18         **THE COURT:**  I agree, and I noticed that in there.

19  When I did read it, I was surprised, and I don't approve of the

20  use of that word in this particular content.  And it is

21  important for all of us to understand that while sometimes when

22  we're talking about religious issues, sometimes emotions can

23  get in the way.  But this is a court of law.  These are

24  documents that are filed in a court of law.  We need to

25  remember that we are all officers of the Court and that we need

1    to keep that demeanor standard high and the civility and to

2    understand that we're all doing our job the best that we can.

3    Yeah.

4              **MR. GEDDES:**  Thank you, your Honor.

5              **THE COURT:**  Yeah.  I --

6              **MR. GEDDES:**  I'll just move on from that point.

7              **THE COURT:**  I'd appreciate if we don't use that kind

8    of name-calling anymore.  I understand what you mean when you

9    use other words instead, like he misinformed the Court.  I know

10   you mean he's calling him a liar; but I'd rather if you'd use

11   the word "misinformed" instead of straight-out "liar," and

12   let's just keep it more civil.

13             **MR. GEDDES:**  Thank you, your Honor.

14             The other challenge that I have here -- and I

15   understand that the Court has invited the discussion, so I'm

16   not being critical of the Court -- is that opposing counsel has

17   done what I had predicted in one of my motions.  I believe it

18   was a motion for clarification.  And perhaps -- perhaps there's

19   not much to be done about it.  Perhaps we're at a stage now

20   where the Court's inviting discussion that touches and concerns

21   expert thought and opinion and religious theology.

22             But I want to say that -- and I just want, for the

23   record, to interpose an objection to what I consider to be

24   testimony in the form of argument.  We've heard a lot about

25   what religions are.  We've heard a lot about what you can and

1    cannot do.  And, so, I believe the proper place for that is

2    with competent evidence in the form of declarations,

3    affidavits, depositions, and the like.

4         And, so, I, obviously, as a non-Jewish person, I

5    cannot, as an attorney, you know, pace for pace, advise this

6    Court of Jewish law.  And, so, to the degree that I believe our

7    client is prejudiced in such a discussion, I would interpose an

8    objection and ask the Court to assign an appropriate weight to

9    what it has heard in that regard.

10        Now, there are things that we can talk about, factual

11   things, things that we have in the evidence.  Plaintiff's

12   counsel stated he doesn't have an expert.  And, so, I'd like to

13   say what it is we're here today to talk about.  We're not here

14   today to see if the State of Nevada can, you know, Harry

15   Houdini its way out of a substantial least restricted --

16   substantial burden, least restrictive half nelson.  That's not

17   why we're here.  We're here today because plaintiffs, who have

18   the burden, have filed a motion for a preliminary injunction.

19        And, so, it's understandable that we've sort of

20   strayed from that, but let it not be forgotten that it is their

21   burden, it is an extraordinary form of relief, and he has

22   confused the idea of a standard with proof.  A person could

23   have a high or a low standard, but you still have to come

24   forward with proof.  And we've briefed this in our --

25   extensively in our brief.

```
 1          Now, you've heard from opposing counsel that, "Well,
 2   what do you want us to do?  We don't have any information."
 3   Your Honor, that statement, in and of itself, warrants denying
 4   the motion.
 5          Now, we've talked about what should -- he's talked
 6   about what should happen and what does happen in prison.  And
 7   to be fair to opposing counsel -- and I applaud his candor --
 8   he doesn't have any experience in inmate litigation.  He has
 9   stated that.  I will represent to this Court that I have a lot
10   of experience in inmate litigation, and I represent that to the
11   Court for the very reason that there is a whole other world out
12   there in the prison world.  And it is common -- I get this from
13   attorneys who will represent a plaintiff and they're new to the
14   area, and it's understandable that they would have a sense of
15   shock and horror about what goes on in prison.
16          The famous case on deliberate indifference, Eighth
17   Amendment, says the constitution doesn't outlaw cruel and
18   unusual conditions; it outlaws cruel and unusual punishments.
19   The idea is that prison is not where anybody wants to be.
20          And I once had a case -- and I was before Magistrate
21   Judge McQuaid, who is now retired.  And there was an inmate
22   with a similar situation with an attorney.  In that fact
23   pattern, I'll represent to the Court, the evidence is there,
24   that it was alleged -- I'll say alleged -- that a particular
25   inmate had a girlfriend who smuggled in heroin, an escape key,
```

1    and, I believe, a knife.  Now, this inmate was in lockdown.  He

2    was protected from everyone.  No one could get to him.  And he

3    was saying how scared he was.  He wanted to be transferred to

4    another prison.  And Honorable Magistrate McQuaid said to me,

5    "Mr. Geddes, he's scared; you know, why don't we just transfer

6    him?"  And I said to him, "Your Honor, prison is a scary place.

7    I wouldn't want to be there.  But that's not the standard.  The

8    standard is not whether prison is scary; the standard is

9    whether or not prisons are complying with federal law and with

10   the constitution."

11            And, so, we can't walk into this discussion with the

12   idea that we have all the niceties and all the conveniences of

13   the free society.  We do not.  So, to the degree that opposing

14   counsel finds it difficult to contact his client or that it's

15   loud and he can't hear it, those are the situations of prison.

16            Now, in contacting an inmate at the prison, there is

17   a -- and you may be familiar with --

18            **THE COURT:**  Okay.  Let me just -- we're kind of

19   getting off track here.  Let me just let you know, in my prior

20   life I represented Clark County in jail litigation.  So, I

21   understand what you're talking about.  And before that I

22   represented numerous defendants and went to jail every single

23   day and had to visit prison many times as well.  So, I

24   understand all that, and I'm comfortable with the situation

25   that you all are explaining.  I understand it.

1           There are issues that you -- that -- there are facts

2    that you cannot provide at this point.  That's what discovery

3    is for.  I think it goes to -- in a preliminary injunction

4    there needs to be a showing of likelihood of success on the

5    merits.  So, naturally, you have to address the merits.  You're

6    not going to have all of the information because discovery

7    hasn't even started yet.  But what you do have is what I look

8    at.  And, so, I understand that it isn't as much as you would

9    have at the end of trial, and I would never, and I don't think

10   any court would, ever assume that you could.

11           But the question is:  What do you have?  And what

12   they have here that they have provided is that there is a

13   change in the menu, which I think is uncontested; and that it's

14   no longer going to be prepackaged, kosher items, but, rather,

15   instead, we're going to try to see if we can't save some money,

16   as most people have been doing for the last couple of years --

17   because I'm not going out to dinner as much as I used to; I'm

18   making dinner at home now.  And I think that's all the prison

19   was trying to do was save some money by not buying a bunch of

20   overpriced -- or maybe they're legitimately priced -- but, you

21   know, a bunch of items that cost more than if you just made it

22   at home, made them in the prison.

23           And, so, the question is whether or not the prison

24   has the ability or is willing or -- to provide the kosher meal

25   that would actually be kosher if you make it at home as opposed

1    to buying it from, you know, some other agency.  So, I think

2    that evidence has been provided, and I don't think that you are

3    denying that there is a change in the menu, that the menu does

4    call for making the food at the prison as opposed to importing

5    it, and that the question is whether or not the prison is

6    capable at this point of providing a meal that is prepared on

7    site which is actually kosher and is not a substantial burden.

8           And, again, I'm very aware that's not just an undue

9    burden or a shocking burden; it's a substantial burden.  It

10   needs to be a substantial burden that is not justified by the

11   compelling government interests and looking at the, you know,

12   the public interests as well, which is to save money in a time

13   like this.  It's very important to keep track of that.

14          So, I realize that it's going to be a burden.  The

15   food is probably not going to be as good or -- I don't know;

16   maybe it will be just as great.  But we need to save money, we

17   need to figure out a way to do that, but we need to make sure

18   that we comply with RLUIPA when we do this.

19          So, I just wanted to -- not to mean to cut you short,

20   but just to, hopefully, satisfy you that I understand that we

21   are just focusing here on what the information is that's been

22   provided at this time.

23          **MR. GEDDES:**  Okay.  Thank you, your Honor.

24          I'm not sure it's a correct assumption to say that

25   before we had prepackaged food and now we don't.

1          **THE COURT:**  Okay.

2          **MR. GEDDES:**  The only food that I'm aware of that is

3   not prepackaged are their vegetables and the fruit.  All the

4   items come to the prison in a factory-sealed container:  the

5   meat, the tuna, the rice veggie mix; the eggs are preboiled and

6   certified off site, so we don't even boil the eggs on the

7   kosher meal.  And, so, that's the whole point.  The system is

8   designed to be -- there is no cooking of meat there; there is

9   nothing.  And, so, it gets in under a lower standard of, like,

10  a kosher restaurant or a manufacturing plant, where they do

11  have inspections.

12         But the issue on those inspections that we haven't

13  talked about is the fact that we've got -- and I think

14  plaintiff's counsel has already stated this.  I believe he said

15  there is Reform, Conservative, Orthodox.  I suspect -- I could

16  be wrong -- I suspect this case is going to be a battle of

17  theologies, a battle of sects, a battle of people saying, "It's

18  our way, not your way," "No, it's our way, not your way."

19         And, so, Rabbi Moskowitz (phonetic), who provided his

20  declaration in support of our motion for leave to file

21  surreply, has testified that the most inclusive standard for

22  kosher food is the Orthodox Union standard.  And that is the

23  standard on which the common fare menu is predicated.  It

24  sounds to me -- and perhaps discovery will take this in a

25  different direction -- it sounds to me that where plaintiffs

1    are most critical is on the issue of inspections.

2              And I have to say that I believe the evidence will

3    show -- we can let discovery do this -- that there are other

4    prisons out there -- I will represent to this Court that I

5    spoke to a representative of the Colorado prison this week.

6    And that was the case -- the famous -- I believe it was the --

7    I want to say the beer case, but I'm going to mispronounce

8    that -- wherein about 15 years ago they got in a lot of trouble

9    for not providing kosher meals.  They are providing kosher

10   meals; there are, I believe, four inspections per year.  There

11   is no continuous, ongoing rabbinic supervision as is called for

12   here.

13             So, Nevada isn't trying something new where it puts

14   them on the moon or on Mars.  It seems that the suggestion is

15   that Nevada is being radical here.  And it's not.  But I

16   believe the evidence will show that within the prison setting

17   the inspections are appropriate.

18             Surprise random inspections.  Now, there's questions

19   about, well, how much of a surprise can it be?  The guy is at

20   the gatehouse.  We can work those issues out.

21             We have also got stronger protocols in place, like

22   video cameras, that are going to be phased in.  They're not

23   there now, but they're going to be phased in.  And, so, when

24   someone says, "I'm doing a random spot inspection, Tuesday

25   night, 3:00 a.m. to 5:00 a.m.; pull it."  "Last September 24th,

1    7:00 p.m. to 9:00 p.m.; pull that tape."  And, so, they're able

2    to pull random spot checks, which statistics does all the time

3    in manufacturing, and they can create, through the assurances

4    of statistics and random checking, a reliable picture as to

5    whether or not there are deviations.

6         There will also be testimony throughout this case,

7    I'm sure, about what does kashrut forgive.  If --

8         **THE COURT:**  Well, I think Mr. Hafter has said that he

9    doesn't necessarily need to have someone supervising 24/7 so

10   long as local counsel of rabbis is used that -- and he defers

11   to them to determine what would be the, you know, I guess,

12   least expensive way to still satisfy themselves that the prison

13   system is providing the kosher meals.  And I think that they're

14   not going to require -- well, I'm not going to speak for them,

15   just as Mr. Hafter didn't want to speak for them -- maybe they

16   aren't going to require 24/7, but I think there was kind of --

17   the door was open there by Mr. Hafter that perhaps his counsel

18   would allow for just spot checks and, like you said, with video

19   cameras.  That's a great idea.

20        **MR. GEDDES:**  Your Honor, thank you.  And I don't mean

21   to misspeak.  And if I misspoke and Mr. Hafter clarified his

22   statement, then I apologize.

23        The issue becomes -- and I don't know how to say this

24   without -- perhaps it sounds a bit crass, but I'm just going to

25   say it, your Honor, and I mean it in all respect; I don't mean

1   to be rude.  I think what's going on here is you've got

2   different religious political groups vying for and jockeying

3   for power to make their insistence upon an institution.  "It's

4   not going to be those guys; why don't you work with us; why

5   don't you work with us?"  And I don't think that's fair.

6         I think what the Court's going to ultimately have to

7   determine is:  What is constitutionally adequate?  It may have

8   to weigh in on issues of this sect, that sect.  It's going to

9   be very tricky.  But I don't think that evidence before this

10  Court that Nevada Department of Corrections has its preferences

11  to go in this direction -- we're not thumbing our nose at

12  anyone else; we're saying this is our discretion.  We're the

13  executive branch.  This is our job, our duty, to uphold the

14  public interest, and this is how we want to go.

15        And in this regard, the NDOC has satisfied that they

16  are providing for the needs of kashrut, and they are

17  accommodating inmates who have a need, a religious dietary

18  need, for kosher meals, and they are also balancing the needs

19  and saving the taxpayers what's projected to be $1.5 million.

20  It doesn't mean that we think these guys are not a nice bunch

21  of guys.  It's just that there is room for debate.

22        There is orthodoxy; there is heterodoxy.  These are

23  things that I am learning now, that I know very little about.

24  And I suspect that if you got a bunch of different sects

25  together and different -- you know, Reform, Conservative, and

1  Orthodox Jews together, they would respectfully disagree, and

2  they probably would have fascinating philosophical discussions.

3  But the question that we have to keep coming back to is, are

4  you --

5          **THE COURT:**  Well, the only plaintiff we have here

6  right now is Mr. Ackerman.

7          **MR. GEDDES:**  Thank you.  And, so, when I say

8  "plaintiffs" -- and that's been tricky, because I know that

9  there is a proposed class --

10         **THE COURT:**  Right, there is a motion for

11  certification on, yeah.

12         **MR. GEDDES:**  Right.  Thank you.

13         I'll try and move it along, your Honor, because I

14  appreciate the value of the Court's time and the parties' time.

15  But I think ultimately this is going to come down to a

16  religious, political ideology, you know, trial, and it's going

17  to be interesting to see how we can resolve that.

18         Now, I do want to just mention very briefly Gary

19  Friedman.  It's my opinion that he's been maligned in this

20  Court, but this is a courtroom, and, you know, people are

21  entitled to their opinion.  Gary Friedman never said, "I got my

22  letter.  Everyone look at my letter.  This is my claim to

23  endorsement."  Gary Friedman has over 20 years -- in fact, Gary

24  Friedman helped draft RLUIPA.  He is a frequent speaker.  I am

25  confident, having qualified experts before, I am confident

1  under the federal rules he will qualify as an expert, and I

2  agree with your Honor; this may come down to a question of

3  weight.  But as to the legal qualification of an expert, he is

4  qualified on so many other grounds other than a letter.  His

5  letter was just a letter saying, "I've got this endorsement

6  letter."  That wasn't the sole basis of his expertise.  If it

7  were, that would be very flimsy indeed.

8          Now, I will say, your Honor, he is in a bit of a

9  work -- a workup right now, because he is now having -- because

10  people have gone to this rabbinical board and, for whatever

11  reason, represented things to be one way, he's had to now

12  explain to him what really has gone on.

13          So, you know, the motion that was previously filed

14  about, you know, we can all disagree -- and I am -- in my --

15  just so the Court knows, in my motion for an order to show

16  cause, I did not ask for sanctions.  I did not ask for

17  disqualification.  I do appreciate the fact that there is a

18  history between Gary Friedman and plaintiff's counsel's people.

19  I'm not saying plaintiff's counsel, per se, but people aligned

20  behind the scenes, and I think -- and I could be wrong -- but I

21  think in the beginning they were trying to move things along

22  and work things out.  Somewhere along the lines it changed, and

23  all I was asking, in a very soft way, was:  Can we not try --

24  can we try not to interfere with other experts?  I'm not

25  denying that there is historical ties between them, and,

1    because of that, I am asking it in a very gentle way.

2            Now, I believe that the evidence is going to show --

3    and Gary will have his day in court, and that's fine -- that

4    he's qualified and that while one sect may want to tear him to

5    shreds, there are going to be other people who say, no, I rely

6    on this guy.  In fact, the Aleph Institute retained Gary in at

7    least two lawsuits.  He has a respected opinion.  So, because

8    he's not a rabbi does not defeat his ability to perform kosher

9    supervision.  Now, I do not doubt that there's disagreement on

10   the point from some camps, but there is agreement on that from

11   others.

12           I mentioned the Colorado plan, and I believe that our

13   plan -- and their plan has been in effect 15 years,

14   thereabouts, and they have informed me -- at least the woman I

15   spoke with, they're not aware that -- and she could be wrong;

16   she's not a lawyer -- but she is not aware that that is

17   currently being challenged.  I empathize with Colorado, because

18   I don't want to bring them into this lawsuit and give anyone

19   ideas to sue them, and I think that, you know, that's probably

20   why I haven't gotten a call back in a few days from them.  I

21   think they need to vet it through their lawyers, because I've

22   done -- I work in the tobacco litigation, and we work with

23   other states, and, you know, states don't -- they respect the

24   fact that we don't want to complicate things.

25           And, so, we've heard a little bit about California

1    rabbi standards.  I think all we're really knowing now is we

2    don't know.  And if we don't know now, there is no basis to

3    issue a preliminary injunction.  There's ideas --

4        **THE COURT:**  Well, actually, Ninth Circuit says in the

5    *Alliance* case that if there are serious questions going to the

6    merits in a hardship balance it tips towards the plaintiff.

7    I'm sure it would be a hardship if, in fact, it's not a kosher

8    meal, that that can support the issuance of an injunction, and

9    that's why I'm inclined to grant the injunction.  My only

10   question is whether I should grant it only as to Mr. Ackerman

11   at this point or to all of the inmates that are currently

12   receiving kosher meals.

13       **MR. GEDDES:**  Well, the challenge that I have with

14   that, your Honor, is that, based on the evidence that's been

15   presented to this Court, their motion, talked about what they

16   thought the menu would be, and they were completely wrong.

17   They said, "They're going to cook milk and meat together and

18   contaminate utensils."  If this Court is sincerely considering

19   or seriously considering granting an injunction, which is a

20   tremendous hardship on the State of Nevada, we would

21   respectfully request that the Court do empanel an evidentiary

22   hearing; because I think that this point I'm outgunned on what

23   I can present to the Court as Jewish authority and Jewish law.

24   And I believe, if we had Rabbi Moskowitz and Gary Friedman

25   sworn in, I believe this Court would have a more balanced view,

1    that the current kosher menu is indeed kosher.  And the

2    evidence that's been provided is nothing more than knocking

3    what we have.  I'm not sure that, you know, raising in a reply

4    brief that, "Well, we don't like this guy" -- that is not a

5    full picture of the evidence.

6           And, so, we're not afraid.  We're not afraid to bring

7    in the evidence, and if this Court is considering that, we

8    strongly -- we'd strongly request, we implore the Court, to let

9    us have our ecclesiastical day in court, because if this

10   Court's --

11          THE COURT:  I'm not satisfied an evidentiary hearing

12   would tell me any different than what I've already heard, only

13   it would be under oath.  Serious questions still would remain.

14   I think that if any one of you had an actual case or a

15   standard -- I mean, this is new for everyone, and I understand

16   that, but --

17          MR. GEDDES:  Well, I'd be happy to provide

18   supplemental briefs on it.  I just think that they certainly

19   have not met their burden.  Their opening brief --

20          THE COURT:  You can certainly file a motion to

21   reconsider the preliminary injunction or to modify the

22   preliminary injunction.

23          MR. GEDDES:  Okay.  Well, then, let me go to the

24   PLRA, which requires -- we have, obviously, the PLRA that -- or

25   the RLUIPA -- that says least restrictive means, but we also

1   now have the PLRA that says any remedy that the Court

2   fashions --

3            **THE COURT:**  Must be narrowly drawn --

4            **MR. GEDDES:**  -- has to be the least restrictive

5   scope.

6            **THE COURT:**  -- which is why I was trying to keep it

7   just to either Mr. Ackerman or just to the kosher inmates and

8   not to all of the other inmates that have a dietary need.

9            **MR. GEDDES:**  Okay.

10           The evidence -- and I just say this for the record.

11   The evidence that this Court has received has been testimony by

12   counsel, which is not competent evidence before the Court.  I

13   think as far as the evidence that's been presented to the

14   Court, what the Nevada Department of Corrections has presented

15   in the form of certified kosher menus, which means that the

16   manufacturer has used a reliable symbol and certified that this

17   food, wherever the rabbinical authority came from on the

18   manufacturer's side, has certified to be kosher to the Orthodox

19   Union standard.  There is no evidence that the food

20   ingredients -- there has been no evidence by the plaintiffs

21   that that food is not certified or is not kosher.

22           And the evidence that's been provided to this Court

23   talks about many safeguard features.  In every one of these

24   prisons there is a separate kitchen, lockable door, lockable

25   area; Colorado doesn't even have that.  So, there is no risk of

1   contamination, because the kosher room is separate over there;

2   many of them have their own kosher sinks; they've been

3   koshered, they've been locked.  And for the prisons that do not

4   have a separate sink area, they follow what Colorado does.  And

5   that is they have kosher --

6          **THE COURT:**  So, there are two separate sections, one

7   for the meat and one for the dairy?  Or is it just the one part

8   of the kitchen where both are?

9          **MR. GEDDES:**  For the preparation of the food there is

10  no preparing of meat.  None.  There is no preparing of dairy.

11  None.  The only dairy on the menu is milk, which is factory

12  sealed from the manufacturer, and that's given directly to the

13  inmate.  The meat is factory sealed, certified kosher, and

14  given to the inmate.  So, we don't get involved in dairy; I

15  mean, we don't cook anything.  The closest anything comes to

16  cooking, which is not cooking, are the rice tofu dishes.  Those

17  are already part -- those are already precooked, and they're

18  simply reconstituted.

19         But the preparation of the food that's opened is done

20  in a separate locked room, and that is, it has a dedicated

21  kosher staff, meaning you're not going to get "Joe" to work in

22  the kosher, he's going to pick up his ladle and come over here

23  to the main line and pick up some spaghetti sauce.  They're

24  dedicated staff, separated and apart.  This has been carefully,

25  carefully designed.

1        As I said, Colorado has been doing this for 15 years.

2   They have kosher designated bus tubs, which are not stacked,

3   and they are inserted in the sinks; and utensils, which are

4   marked "kosher" and they're clearly identifiable and they are

5   designated only for kosher food, are washed, they're walked

6   back into the locking room, and they're put in a locking

7   cabinet.

8        The plaintiffs also complained, "Well, you know,

9   we've got trays that might be contaminated because the main" --

10  guess what?  All disposable containers, Styrofoam and the like,

11  that's safe for inmates when they don't burn and it becomes a

12  weapon.

13       So, there is no reason, there is no competent

14  evidence before the Court, that shows that there are serious

15  questions about cross-contamination.  The only issue that they

16  seem to be bearing down on, that we've focused on, is the need

17  for continuous, ongoing rabbinic supervision.  And that is a

18  hotly contested matter.

19       So, rather than point out that our kosher symbols

20  aren't reliable; they are.  Rather than point out that we don't

21  have separate kitchens; we do.  They are creating a

22  hypothetical parade of horribles that might happen.

23       I have case law.  And the case law talks --

24       **THE COURT:**  Was there any rabbinical supervision

25  before?  Or was that not necessary because of the current plan

Case 2:11-cv-00883-GMN-PAL   Document 104   Filed 03/15/12   Page 75 of 135

1  everything is packaged?

2      **MR. GEDDES:**  My understanding is we've never had

3  continuous rabbinic supervision.  The current kosher meals, to

4  my understanding, use the, as a staple of it, a -- what the

5  army uses, the meals ready to eat.  But the cutting boards, if

6  there is cutting of vegetables, if there is preparing in that,

7  it's kosher, kosher designated, locked.

8      And the State of Nevada has been very, very careful.

9  We hear complaints that, "What took them so long?"  You know

10  what?  We're vetting the process.

11      **THE COURT:**  And this is what Chaplain Friedman has

12  been doing?

13      **MR. GEDDES:**  Yes.  He's been doing that.  And to his

14  credit, there was questions about his limitations; "Oh, he

15  can't -- he's just a -- he's not qualified."  He does not live

16  in a vacuum.  He has said in his declaration, and he's told me

17  many times, "I'll pick up the phone."  He won't hesitate to

18  call the president of the Orthodox Union to ask a question

19  about, you know, in our -- I want to say esoteric area of this

20  or that.  He is very dialed in.  And he has spent a lot of time

21  working on this model.  And to some degree -- and I haven't --

22  I don't have the evidence in front of me -- I am told that

23  there are other states that, you know, use a lesser version of

24  what we're doing.

25      But this is a well-thought-out plan, and there is no

1   competent evidence before the Court.  All we have is

2   supposition.  And the granting of a preliminary injunction, we

3   believe, I suspect, will cause a great number of people to try

4   and fit into that court's order.  So, it would defeat the idea

5   of limiting it to a class of one.

6        Now, you know, I can take that to my client, because

7   I want to give my client as many options as possible, the idea

8   that if you kept Inmate Ackerman on a Travers Greene diet -- by

9   the way, we've heard about Travers Greene.  By and large,

10  that's what the current kosher is.  It was derived from the

11  Travers Greene model.  And that's what's costing the State of

12  Nevada, dollar for dollar, $1.5 million more.

13       If this Court were seriously going to entertain

14  granting some form of relief to Ackerman, I would be foolish

15  not to take the idea back to my client that, you know, you put

16  him on a Travers Greene menu, and stop the harm, and have that

17  be not the granting of a preliminary injunction, but a

18  modification of one particular inmate, and then throughout the

19  life of this case we can finally get to a point at the end of

20  it and litigate it, but we really are worried about the

21  bandwagon effect, and that's what's costing so much.

22       **(Pause)**

23       We've heard a little bit about Rabbi Moskowitz.

24  Rabbi Moskowitz was very hard for me to come by.  I tried very

25  hard to get a hold of him in the beginning.  He's been very

1  busy in California.  It's only recent that he's come back like

2  a boomerang and he's expressed a willingness to help.  And, so,

3  I believe that if this Court in any way is accepting a lesser

4  opinion of him than he deserves, I would request, "Why not

5  bring these people in?"  This Court can weigh their credibility

6  and be impressed or not impressed as to whether or not they

7  seem to impart religious authority and know-how to the point

8  where it may be a very narrow issue.

9          **THE COURT:**  Okay.  Well, currently the implementation

10 of the plan is scheduled for February 21st.

11         **MR. GEDDES:**  That is correct, your Honor.

12         **THE COURT:**  So, are you offering, then, to postpone

13 the implementation in order for us to have a preliminary

14 hearing, or did you want to have a preliminary hearing on the

15 20th?  Or --

16         **MR. GEDDES:**  Thank you, your Honor.

17         **THE COURT:**  -- do I issue a preliminary injunction

18 and then -- you tell me.

19         **MR. GEDDES:**  I don't have authority to do that.

20         **THE COURT:**  Okay.

21         **MR. GEDDES:**  I'm happy to coordinate any idea that

22 the Court has.  My sense of things is -- and I can't reveal

23 attorney-client communications, so without doing so, I will say

24 to the Court I'll represent that what my sense of things is,

25 there is a great urgency.  We already are short budgeted.  Time

1  is of the essence.  They want to roll this out.  They want to

2  get going.  And I suspect -- I could be wrong -- but I suspect

3  if I went back to my client with the idea that we just not roll

4  out on the 21st, if that meant delaying it for some significant

5  time, I think that I would probably get yelled at.  Because

6  there has been a lot of planning, a lot of thought.

7          There's food that's been ordered.  There are --

8  there's equipment that -- I went to a koshering yesterday at

9  Northern Nevada Correctional Center.  We went from four

10 prisons; we added two more.  We went to six.  I watched Rabbi

11 Brontein (phonetic) perform koshering.  There is a stainless

12 steel table in wrap.  It's brand new.  We spent a lot of money

13 buying new sinks, just to remove all doubt that it isn't

14 kosher.  We've got stainless steel tables.  We've got carts

15 that we've made, stainless steel lockable carts.  We built out

16 a cage in Lovelock.

17          Gary Friedman -- there was a question -- there was a

18 point that was made that is inaccurate.  The question was, "Ah,

19 he doesn't have any authority; this is prison."  That's

20 absolutely false.  They -- the prison has looked at him as

21 their consultant, their expert, and what he's asked for he's

22 gotten.  And I can produce evidence of that.

23          In fact, when I went to Lovelock, Gary Friedman saw

24 that there was no dedicated kitchen area.  Gary says, "You need

25 a dedicated kitchen area."  And they said, "Fine.  Well, we're

1   limited in space."  And Gary walked around and said, "You know

2   what?  Right here, in this space, build a cage.  Build a cage

3   and lock it."  And that's what we did.  And that's a kosher

4   room now.  And inside that there's room for tables and food

5   preparation and the locking cabinet.  So, the notion that Gary

6   Friedman cannot impart a great influence on getting the design

7   of the prison to comply with the Orthodox Union standards is a

8   misimpression.

9           Let me just wrap this up, because I know that I've

10  taken quite a long time here.

11          I do want to talk, if I may, your Honor -- just

12  because the issue has been brought up, I would like to talk a

13  little bit about Inmate Ackerman.  It is a false statement to

14  say that the State of Nevada has not produced evidence

15  concerning his misdeeds in prison.  I'm not talking about what

16  got him to prison; I'm talking about the things he did in

17  prison.

18          I will not present this to the Court, because it's

19  unfair.  I want to give plaintiff's counsel an opportunity to

20  see this document.  I have a document.  It's a new declaration

21  from Associate Warden Lisa Walsh.  And she confirms that there

22  is still bad blood between Mr. Ackerman.  We'll get into that

23  later, but I want to say, without disclosing confidential

24  inmate information, that one cannot assume that the person who

25  is the separatee, or the enemy, is the person for whom the

1  disciplinary charge was dropped.

2          In fact, we will take plaintiff's suggestion, and we

3  would request an in-camera, in-chamber discussion where we can

4  discuss who this person is and what the crime is -- and what

5  the problem is.  The problem is, if we did this in open court,

6  the identity of what occurred would likely reveal who this

7  person is.  There are grave, grave concerns about Inmate

8  Ackerman coming back to the prison.

9          I'll say no more on that, but we have evidence, and I

10 will represent that to the Court.  And we have already produced

11 evidence in the form of the classification records and in the

12 disciplinary charges, which talked about what the incidents

13 were.

14         And I just want to say one more thing on this point.

15 I hear this a lot from inmates, all the time.  Just because a

16 charge is dismissed, or just because a charge is pled down, it

17 does not -- it is not the equivalent of exoneration.  In this

18 case, the reason why -- and this is in the declaration of Steve

19 Suey (phonetic).  He listened to the disciplinary tape, and I

20 am happy to make copies and provide that to the Court.  I don't

21 think that's necessary, but we're not hiding anything.  The

22 reason why they did not convict him of the charge of an assault

23 against another -- trying to arrange for an assault of the

24 other inmate is, as he said in his declaration, when the

25 investigator went to them to try and get them to corroborate

1    this, they were all so mad at him -- for lots of reasons they

2    were just mad at him -- that he said, you know, "They're angry.

3    I can't corroborate; this doesn't meet the prong test."  It

4    doesn't mean he was exonerated.  And we're happy to provide

5    evidence of that.

6           Moving on to the other issues, we did talk about

7    confusing the proof with the likelihood of success, you know,

8    regarding the balance of equities.  I would implore the Court

9    not to simply look at the equities for the plaintiffs in

10   religion, but also the State of Nevada and the -- we agree with

11   the Court; a lot of the case law that the plaintiffs have cited

12   is not an issue of provide or don't provide, but it's to switch

13   the program.  And we've provided competent evidence to the

14   Court that the current -- I'm sorry -- the common fare menu,

15   both with Rabbi Moskowitz, who is a rabbi, and Gary Friedman,

16   that the common fare menu is kosher.

17          And I think this Court may want to make an inquiry,

18   because I think there is a term that's been bandied about, and

19   we haven't really drilled down on it, and the term is

20   "certification."  I am not an expert, but my understanding,

21   right or wrong, is that the term "certification" means

22   something along the lines of:  You're a restaurant; you got a

23   letter from a rabbinical authority, from a -- or some other

24   agency that certifies kosher restaurants; and you got a letter,

25   and you hang it up, and that's been certified.  I would ask,

1  respectfully, plaintiffs to identify for us any prison in the

2  country that has a certification letter.  They may be hard

3  pressed to come up with it.  So the model of getting a

4  certification letter or a certification may not be one that

5  applies to prison, and it certainly doesn't evidence that

6  something is not kosher.

7        The suggestion that there be an Orthodox Council of

8  Rabbis to dictate to the prison, all that really is, is:  Your

9  Honor, please favor our guys; let our guys dictate to what goes

10 on there.  And I don't think that's fair.  I think what needs

11 to happen is there needs to be a trial, the Court needs to hear

12 from many rounded opinions, and the Court can come to its own

13 conclusion.

14       As I said earlier, Rabbi Moskowitz has testified

15 under oath in his declaration that the Orthodox Union standard

16 is the most inclusive, and that's what the prisons want.  As

17 far as -- we talked about the letter and he's not going out

18 there -- Gary Friedman is not going out there as an agent of

19 anyone.  He's his own man.  He's not saying I'm out here for

20 the Washington Rabbinical folks.

21       I mentioned that, you know, he's very well versed not

22 only in kosher but inmate legal issues.  He assisted in the

23 drafting of our lupa (phonetic), and Rabbi Moskowitz works for

24 the California prisons.  So there are other considerations than

25 just kosher.  It's kosher and then prisons.

1          With respect to the purchases that inmate Ackerman

2    made there were statements, words to the effect that, you know,

3    you can't ding them for that, that's not him.  I have to say

4    that the evidence we have produced in the declaration of Dawn

5    Rosenberg clearly establishes that there is a computerized

6    system, inmates have a card, they purchase it, they check the

7    books, they debit the account.  There is no monkeying around,

8    Joe isn't buying, walking in with Larry's card.  That's not

9    happening.  This is prison.  They are very good at what they

10   do.  They are experts at prison security.

11          And so we know, we know that he purchased these

12   items.  Again, at a later time I will produce the declaration

13   of Lisa Walsh (phonetic) where she confronted Mr. Ackerman on

14   this.  And he stated to her:  I wasn't breaking that rule; I

15   was breaking a different rule.  I was giving it away to other

16   people.  As the declaration explains, it is against the

17   administrative regulations for inmates to trade, barter or give

18   away products.  There are so many problems with that.  Inmates

19   could be pressured.  When they do cell checks and they shake

20   down you have a radio assigned to the wrong guy, they can

21   assume, wow, did you pressure that guy to give it to you?  It's

22   very, very controlled in prison.  Everyone wants what another

23   inmate doesn't.

24          So when inmate Ackerman admits, hey man, I'm just

25   giving it to someone else, he is admitting that he is violating

1    the prison penal code.  And if he's admitting that he's doing

2    that and he's also creating an appearance of impropriety with

3    respect to being kosher, we will produce evidence -- in fact,

4    it's in this declaration --

5         **THE COURT:**  What about the fact he hasn't done it

6    since March of 2011?

7         **MR. GEDDES:**  Thank you.  That's a very good question.

8    Since -- I believe the date was given in February,

9    February 24th.  I think that's incorrect.  We produced evidence

10   that it went further.  There is no doubt, there is no doubt in

11   our mind that there came a time when inmate Ackerman knew he

12   was going to be the poster child for a big cause, a big class

13   action.  How do we know that?  There are people who tell us

14   that he brags to them, ah, don't you know who I am?  I'm the

15   guy who single handedly is getting rid of this or that.  So of

16   course he knows he's going to be watched.

17        When do we look at what he does?  We look at what he

18   does when he doesn't think it matters or when he doesn't think

19   people are looking.  It's the little things that people does.

20   He knows he couldn't get away with it.  Plus, in the

21   declaration of Lisa Walsh she confronted him and said:  I'm

22   warning you, don't do that.  So he knew he was under the radar.

23        So the idea that an inmate is saying it's not mine, I

24   was giving it to someone else; well, we know two things:  We

25   know that you're breaking the rule; we know you ordered it.

1   And so, you know, one inmate advised Lisa Walsh.  And we don't

2   know if it's figurative or literal.  He would always preach to

3   us with a ham sandwich hanging out of his mouth.  There are

4   serious concerns about his sincerity.

5          Now, he may want to rehabilitate.  It seems humorous,

6   I admit.  When I heard that and it was written down, it seemed

7   funny.  But the point is, is that just yesterday Lisa Walsh did

8   some investigation.  And there are current animosities with

9   others in the religious NNCC group.  We can get all that in

10  discovery.  But I'm just saying --

11         **MR. HAFTER:**  Your Honor, that's not part of the

12  record of this case.  I've been kind of patient, but I've got

13  to object.  I mean --

14         **THE COURT:**  The ham sandwich?

15         **MR. HAFTER:**  Well, all of that.  I mean this

16  declaration of Lisa Walsh, all this, it's not evidence in this

17  case.  You know, I've already complained that they've

18  sandbagged us by providing evidence late.  And now at the

19  hearing they're bringing up stuff that we have no idea what

20  they're talking about.

21         **MR. GEDDES:**  I believe the issue was raised that we

22  don't have evidence.  We've already provided evidence.  I'm

23  just -- and the issue was raised that this person is being

24  dinged.

25         I believe it's fair game to address these points in

1  rebuttal.  But I'll move on, your Honor.  I'll move on.  We

2  believe it goes to sincerity.  And again, it doesn't mean

3  someone is exonerated because they decided they didn't want to

4  move on with it.

5            The issue about the ultra vireism, I'm happy this was

6  brought up.  Plaintiffs are certainly free to file an amended

7  complaint.  I might save them some trouble.

8            I'm holding in my hand -- and, you know, you can

9  claim this is new evidence; I'm just trying to help.  Please

10  review administrative regulation NDOC AR100.  NDOC AR 100.01,

11  Development of Administrative Regulations.  Subsection 6, a

12  draft regulation which has been signed by the director shall

13  become a temporary regulation with a force of policy until the

14  next meeting of the board of prison commissioners.

15            Now, they did address this in passing in their

16  briefs.  And they said:  Well, look what happened.  You got a

17  December date and this wasn't -- notice wasn't given back in

18  November.  But if they look carefully, it works the other

19  direction.  A December date says will be effective way out here

20  in February.  That's more than 30 days' notice.

21            So I believe if that amended complaint is filed, that

22  is subject to dismissal; it would be a futile claim.  I would

23  request that the Court invite briefing on a motion to amend

24  rather than just allowing them to amend, because we can nip it

25  in the bud without actually amended on that --

1          **THE COURT:**  I have told Mr. Hafter he can file the

2     motion for leave to amend, and you can file your response.

3          **MR. GEDDES:**  Thank you.  And so I believe that with

4     retaliation we agree with this Court.  We believe we've

5     established competent evidence.  This is a classification

6     decision.  As this Court is well aware, dealing with inmate

7     litigation, inmates do not have a liberty interest in the local

8     of their confinement, they cannot be retaliated against, they

9     cannot be transferred for unconstitutional conditions.  Fair

10    enough.  But we have met our burden to show -- and this is

11    critical, your Honor; I really want to focus on this.

12          There is this claim that in June filed a lawsuit;

13    man, he was transferred right away after that.  That's

14    incorrect.  The disciplinary proceedings that resulted in his

15    transfer had roots in March, March of 2011, many months before

16    a lawsuit was filed.  There is no nexus, there's no logical

17    conclusion that uh-oh, he filed a lawsuit; let's start trumped

18    up charges; this is what I hear.  We hear that all the time.

19    That's simply not true.  These are professionals.  There was an

20    investigation done regarding a very serious allegation.  In the

21    prison when they don't take these allegations seriously, they

22    get sued for failure to protect inmates.  And so I believe that

23    the evidence will show all this if we have to go down all these

24    roads.  But retaliation is not going to hold up.

25          And finally, your Honor, I would just say that I

1  think we've answered all -- we've answered all of Plaintiffs'

2  questions.  We may not have hit all your questions.  The time

3  is short.  So I would respectfully urge and implore the Court

4  to allow us to further brief or have a hearing with experts

5  before it would grant preliminary injunction; that is one

6  inmate, and they're all in and the costs will go up.

7          And so I ask the Court to look at the evidence that's

8  been provided in the briefs, and I believe the Court will find

9  there is no compelling evidence, there's no substantial

10  evidence, there's no evidence at all; there's just testimony

11  and talking about -- you know, and Rule 72 requires points and

12  authorities, your Honor.  And there's case law that says, you

13  know, not just points and authorities that says points and

14  authorities.  Points and authorities that track -- the

15  authorities track your points.  And I don't believe we have

16  that nor do we have competent evidence.

17          And so in conclusion, your Honor, the balance of the

18  evidence, competent evidence before this Court, there are

19  separate kitchens, all those protocols, and the food is

20  certified, it's sealed.  We believe that we've more than

21  rebutted their burden to establish that there is imminent harm

22  facing their clients.  Thank you, your Honor.

23          **THE COURT:**  Thank you.  Mr. Hafter?

24          **MR. HAFTER:**  Thank you, your Honor.  In order to

25  ensure the kosher status of any commissary there's a

1  fundamental policy universally that the oversight and

2  responsibility of the kosher venue be certified by a reputable

3  rabbi or a recognized certifying agency.  The supervision

4  entails everything from the raw materials to the finished

5  product ready for consumption or requires the ongoing oversight

6  (quote/unquote).

7          Document 53-1 at Page 4, a letter from the head

8  Kashrus administrator of the largest certifying agency from the

9  Western United States KSA, was provided to this Court,

10 specifically related to this case.  I think that's pretty clear

11 and convincing evidence that we need ongoing oversight, and we

12 need a certification from a reputable agency.

13          I think also the fact that we provided testimony and

14 declarations from a rabbi in another case that a U.S. District

15 Court relied on as appropriate authority and evidence as to

16 what the kosher standards are, namely, Rabbi Grossman, I think

17 that that goes to meet our burden.  We have evidence that

18 suggests -- and we're not talking about the separation of

19 utensils.  We're not talking -- we're talking about the lack of

20 a certification and a lack of ongoing supervision.  Those are

21 the issues in this case.  We have evidence here.

22          And the funny part is he says:  Well, we're going to

23 go to the Orthodox Union standard as the most inclusive.  We're

24 fine with that.  We've got no problems.  However, has he ever

25 offered to suggest that his new California rabbi will meet the

1    Orthodox Union standard to certify this program?  No, he can't

2    because they won't.  Bring the Orthodox Union in here and

3    certify it and we're done.  What's the hard part?  We don't

4    have a problem with that.  But they won't.

5           And so, your Honor, there is a serious question.  But

6    let me address a couple of issues.  Thank God for technology,

7    because I have a question to our exhaustion question; I have an

8    answer.  *Thomas versus Schwartzenegger* (phonetic), 2011 Westlaw

9    4501002, an Eastern District California case in 2001, cites

10   *Gates v Cook,* 376 F.3d 323, which is a Fifth Circuit opinion

11   from 2004.  And I realize it's not Ninth Circuit law, but under

12   a quick Westlaw search sitting at counsel [sic] during argument

13   I think it's pretty good.  And the Court, *Thomas versus*

14   *Schwartzenegger,* said, "The fact that one class member has

15   exhausted administrative remedies is sufficient to satisfy the

16   PLRA's exhaustion requirement for another member of the class."

17          So I don't think we have to ask each and every member

18   of this class, which we hope you'll certify, to first exhaust

19   before they opt into the class.  The fact that Mr. Ackerman has

20   exhausted is good enough.

21          Now, are we going to limit the injunction to just

22   Mr. Ackerman or to all inmates receiving the kosher meal

23   currently?  The only thing that would happen if you said we're

24   going to limit it to Mr. Ackerman is I'm going to start filing

25   numerous more lawsuits on behalf of all the other prisoners

1    that were in my office with emergency motions for a temporary

2    restraining order or preliminary injunction based on the same

3    exact issues why it's issued against Howard Ackerman.  And it's

4    just going to drive up the costs; it's going to drive up the

5    use of judicial resources.

6              The point is, is this is the prime example of a class

7    where this Court should act to protect all the interests of the

8    members.  If it finds that there is a substantial burden on

9    Mr. Ackerman -- or questions that lean towards proving a

10   substantial burden of Mr. Ackerman's right to free exercise

11   through use of kosher meals, then everyone who is currently

12   obtaining kosher meals, their right to free exercise is equally

13   burdened.  And so, therefore, they're entitled to an injunction

14   as well.

15             So we're fine limiting it to just people on the

16   kosher meals plan, but it needs to be all the people who want

17   to receive kosher food.

18             Now, there's been a discussion that I've been having

19   with myself and a couple of other people about this equal

20   protection.  I didn't want to raise it because I really am not

21   sure if I'm chasing windmills or not.  But it was raised.

22   There is evidence in the record that Mr. Ackerman has filed

23   grievances that his kosher meal is not the same as Traver

24   Greene's (phonetic) kosher meals, that the current kosher meal

25   plan for everyone else is not the same as Mr. Greene's.  Is

1    that an equal protection violation?  It may be.

2          But worse, what happens if they implement the common

3    fare menu and they're still giving Mr. Greene's kosher meals

4    under the settlement agreement that they have?  Now there's

5    absolutely an equal protection argument.  And so all that we

6    would be doing is on behalf of Mr. Ackerman and every other

7    Jewish inmate who wants kosher meals is creating even more

8    causes of action to engage in further litigation if we don't

9    stop this.

10          When an attorney -- I want to hit one more point

11   quickly.  I spent the first half of my career as an attorney

12   not litigating.  I didn't even know what a courtroom looked

13   like.  And there were a couple of litigators.  There's a

14   gentleman up in Helene (phonetic) -- right now it's something

15   else, Holland & Hart in Reno, a very skilled litigator.  And he

16   used to -- I'd say, "How do you do this?"  And he would say "My

17   job as a litigator is to become an expert on my subject

18   material that I'm going to argue that day, and then when I go

19   home forget it and learn what I need to know for the next day.

20          There are attorneys who know more about medicine than

21   physicians.  The fact that I know about Kashrus doesn't mean

22   that I'm testifying.  It means I'm doing my job as an advocate

23   for my client.  I take a little bit of offense to the arguments

24   that I can't sit here and advocate for my client through

25   argument, because I know very well that if push comes to shove

1    and when the time comes -- it's not if, when -- I'm going to

2    have to back up everything I'm saying with credible evidence

3    for this Court.  That's being an advocate and an attorney.

4    It's not testifying.  And so I have a hard time without

5    objection.

6         **THE COURT:**  I see it as no different as Mr. Geddes

7    testifying about what the inside of the kitchen looks like and

8    what has been purchased and so forth.  And you all have

9    experience and I hold you to the utmost standard as officers of

10   the Court that you are telling me the truth without the

11   affidavit that would otherwise need to be filed at this point.

12        You know, we're at the preliminary injunction stage.

13   This is not a bench trial or a jury trial or whatnot.  In that

14   case then, of course, I would require you to have evidence and

15   not to be able to argue anything unless it was based on

16   evidence that had already been submitted.  But at this point I

17   think it's quicker since we're looking at a February 21st

18   implementation to go ahead and consider some of the

19   clarifications provided by counsel that are factual rather than

20   legal just for assistance for the Court in putting this all in

21   the proper context.

22        **MR. HAFTER:**  Thank you, your Honor.  Just a few more

23   points.

24        He kept arguing that we're going to burden the state

25   if you issue this preliminary injunction.  I want to keep it in

1   mind that all we're asking you to do is maintain the status

2   quo.  We're not asking you to ask them to do more than what

3   they're currently doing.  That's a very important point that I

4   think has not been addressed.

5           **THE COURT:**  I think all preliminary injunctions

6   burden the Defendants.

7           **MR. HAFTER:**  I want to talk a little bit about

8   Mr. Friedman.  I want to make it very clear, even though I

9   think that this will come up again.  First of all, I had never

10  seen a motion for order to show cause that it's a soft way of

11  asking.  They're pretty heavy handed, but notwithstanding --

12          **THE COURT:**  That's before Judge Leen.

13          **MR. GEDDES:**  Well, with respect to the weight that

14  you're giving Mr. Friedman's evidence, I just wanted to be

15  clear that I contacted the Va'ad in Seattle.  I didn't make

16  things up.  I gave them Mr. Friedman's declaration.  They wrote

17  that letter based on Mr. Friedman's declaration.

18          And then he said Mr. Friedman doesn't live in a

19  vacuum.  You know, he picks up the -- why didn't he call the

20  Va'ad?  Why didn't he talk to this organization that he had

21  such a great relationship with for 20 years about what he's

22  doing in Nevada if he really doesn't live in a vacuum?  Or

23  better yet, if he has such a relationship with the Orthodox

24  Union that he call up the president.  Why not ask the Orthodox

25  Union to certify this program?

1          It is true that many prisons aren't certified kosher.

2    But many prisons recognize that the rules of Kashrus in food

3    preparation are so arduous that it's easier to order in than to

4    make your own food.  And so many prisons don't try to do what

5    Nevada is doing.  And with respect to Colorado, none of that's

6    in the evidence.  And Colorado's practices aren't at issue

7    here, you know.  It's Nevada's prelan (phonetic) practices that

8    we're trying to oppose.

9          There's an old joke about two rabbis that are on a

10   desert island, and all of a sudden a third breakout shul

11   synagogue forms.  Yes, you get a bunch of rabbis into a room;

12   they're going to disagree.  And that's why you have a rabbinic

13   council, your Honor.  But they're all Orthodox rabbis.  And

14   most of the time they use the Orthodox Union standard or

15   whatever standards mirror that.

16         We're not asking for anything different.  The problem

17   is, is the rabbi from California is not an Orthodox rabbi.

18   He's a reformed rabbi.  And if they're going to keep saying we

19   need to use the Orthodox Union standard, let's have an Orthodox

20   rabbi proceed with the supervision.

21         Thank you, your Honor.

22         **THE COURT:**  Okay.  Thank you, Mr. Hafter.

23         **MR. GEDDES:**  Your Honor, briefly.  The points just

24   raised bring the following to mind.  The distinction between

25   opposing counsel talking about Kashrut and me talking about the

1    inside of the cages --

2          **THE COURT:**  Oh, my Lord.  Okay.  Listen, Mr. Geddes.

3    Here's the issue.  I need to decide whether I'm going to be

4    granting the preliminary hearing as to only Mr. Ackerman or as

5    to all inmates.  You already have heard Mr. Hafter explain to

6    you the different issues that arise that I had thought of in

7    the past that is -- you know, there's the class action request,

8    that is, the class certification request that I need to have

9    further briefing on I believe.  But if I am to grant the

10   preliminary injunction only as to Mr. Ackerman, you know I

11   haven't seen the docket; but there are other individual inmates

12   who have already motioned the Court for permission to -- I want

13   to say interfere -- what is the word, intercede?  I just forgot

14   what the word is.

15         **MR. HAFTER:**  We're fine with "interfere," your Honor.

16         **THE COURT:**  In a plea -- to also participate in the

17   case.  An so no doubt they would want to file their own

18   lawsuits as well.  I think one of them already has a separate

19   lawsuit that's being heard up in northern Nevada.  And they

20   will ask for the TRO, as Mr. Ackerman has had, and the evidence

21   will be substantially the same.  So, you know, they can assume

22   that it will probably be granted as well.  In addition they

23   will have that other additional claim for due process

24   violation.

25         I'm trying to narrow this as much as possible and I'm

1    trying to foresee, which is difficult looking into a crystal

2    ball that I don't have, how this is going to impact the

3    department.  It is not my purpose here to impact the department

4    negatively.  I'm presented with an issue where I've already

5    said what the standards are under the *Winter* case whether

6    there's a likelihood of success on the merits.  I'm not finding

7    that there is.  Whether there's a likelihood of irreparable

8    harm in the absence of preliminary relief, I think there is.

9    Whether the balance and equities tip in the favor of the

10   Plaintiff, I think they do; and whether there's an injunction

11   would that be in the public interest.  And I believe that that

12   one is kind of a wobbler; it kind of goes both ways.

13          Looking at just the standards of law -- and I'm not

14   sure if there's sufficient basis here for the preliminary

15   injunction, but looking at the *Alliance* case that the Ninth

16   Circuit asked us to look for in balancing the serious questions

17   that I presented in this case.  And there are, there are

18   serious questions.  This is an issue of first impression.

19   There's not a whole lot of case law that I've -- well, there's

20   no case law on point, first, no case on point.  But there are

21   other cases that are similar but not similar enough that I can

22   say unequivocally and very comfortably that I know exactly how

23   this case is going to come out.

24          So there are serious questions, and they go to the

25   merits of the case.  Not the factual questions.  I'm not

1  talking about whether or not Mr. Ackerman did or didn't eat the

2  kosher food.  I mean the legal merits of the case.  And looking

3  at the hardship balance it does tip towards the Plaintiff,

4  because if there is not kosher food available -- I mean this is

5  not talking about whether or not my tennis shoes are

6  comfortable.  This is about food and sustenance that the person

7  needs.

8            And I already mentioned to be able to, you know,

9  continue to practice the religion.  And I think that there

10  is -- the balance does tip in favor of the Plaintiff and it

11  does support an issuance of an injunction, because the other

12  two, when it has irreparable harm and the public interests are

13  also met, if you'll look at that wobbler, I mean there's an

14  interest here, obviously, for all of us to have the Department

15  of Prisons provide for all the inmates as well as for the

16  guards and everybody else to have a safe and a very fair system

17  of justice where the community can be safe and the inmates can

18  still receive all their constitutional liberties and all of us

19  don't have to pay more taxes in order to be able to do that.

20            But clearly, that's the situation we have here is

21  trying to brainstorm what is the best way, the most effective

22  way, to balance all these concerns.  There's a change.  The

23  kosher menu that we had in the past, the Traver's Green, is no

24  longer going to be provided.  The Department has decided to

25  implement this other common fare menu plan that is more

 1   economical for everyone.

 2          So I have to look at whether or not there's a serious

 3   question, and I find that there is.  And I am not comfortable

 4   denying the motion for a preliminary injunction, so I'm going

 5   to grant it.  My real issue now is whether to grant it at least

 6   to Mr. Ackerman -- and it doesn't bother me if you file more

 7   cases.  I mean they're either going to be filing the cases and

 8   be heard as a class or individually, and they'll probably all

 9   consolidate and the judges will ask me to go ahead and receive

10   them since mine is the first case number, and I will.

11          And I have a number of different cases like that

12   where I've kept them together just for purposes of discovery

13   but not for purpose of the trial, or I've kept them together

14   for this, that and the other just to make it judicially

15   economical; and I don't mind doing that.  So probably they'll

16   all end up in my courtroom anyway, most likely.  If they are

17   filed individually, that would mean you would have to respond

18   to every single one of those; maybe you would just cut and

19   paste it.  But I do have a concern with that additional due

20   process issue.  I don't want to make it uncomfortable for you.

21   I know you don't have your client in here and you don't have

22   someone here to tell you whether or not you could just

23   implement it to everyone else.

24          And I guess I never heard from you whether my

25   understanding was correct, whether it's just about 100 inmates

```
 1   that are kosher at this point within the state or is there
 2   more?  Because I hear Ms. -- I see Ms. Rosenberg shaking her
 3   head.
 4            MR. GEDDES:  I can give you that exact number or she
 5   can give that to you.  But, your Honor, in fashioning your
 6   remedy -- that seems to be where you're going with this --
 7            THE COURT:  Yes, I want some help.
 8            MR. GEDDES:  And I'm glad you raised that point, and
 9   I forgot to mention this.  It is not correct -- and I believe
10   that Plaintiffs' counsel has already stated this to the
11   effect -- that a one size fits all.  We are giving kosher meals
12   to Messianic Jews who by some account, some people characterize
13   as Christians who want kosher food.  So it is not an accurate
14   assessment to say everyone needs to rise to the level of the
15   standard this Court would be assigning to Mr. Ackerman.  There
16   may be folks who say give me the reformed kosher food.  There
17   may be folks who say give me the middle ground, give me that.
18   And so it's very troubling to think that without further
19   hearings or investigation or evidence on this we would have a
20   one size fits all for the class.  So my recommendation is if
21   the Court --
22            THE COURT:  So you're saying that even the individual
23   inmates that are receiving kosher meals now there are some that
24   don't necessarily require the rabbinic supervision because
25   they're not Orthodox; for example, if they're reform or
```

1    something else.  Is that what you're telling  me?

2         **MR. GEDDES:**  I think that bears investigation.  I

3    don't know.  I do know this, that who we have today, we have

4    inmate Ackerman who professes in his complaint to be an

5    Orthodox Jew.  I think what this Court has heard for the last

6    couple of hours now is what do Orthodox Jews require.  There's

7    been a dispute about it.  But Messianic Jews or, you know,

8    certain Methodists, I mean it is not a one size fits all.  And

9    to the degree that others who require a kosher meal do not

10   insist upon such scrutiny they wouldn't necessarily even fall

11   in the class, the Messianic class.

12        But if you're going to fashion a remedy and this

13   Court wants to restrict it to the least restricted scope to

14   correct any perceived violation, there has to be further

15   inquiry.  And so, of course, without even talking to my client

16   it stands to reason and common sense, do I think my client

17   would rather have an injunction against it limited to one

18   person versus an entire class?  Absolutely.  I don't have the

19   authority to say that, but my hunch tells me my client's going

20   to say if the Court says I have a choice between giving it

21   to Ackerman and giving it to others, give it to Ackerman.  That

22   stands to reason.  But I don't think for the reason which you

23   just said that you could assume that everyone who requires a

24   kosher meal requires the same level of scrutiny that the

25   Orthodox claims of Ackerman would require.

1          **MR. HAFTER:**  Your Honor, I'm sorry.  They don't

2    provide different levels of kosher meals now.  You either get

3    the kosher meal or you don't get the kosher meal.  And, in

4    fact, the matter is reformed -- there is no place for kosher

5    meals in the reformed movement.  That's my point your Honor,

6    okay.  That's why we can't go by a reformed rabbi.  And for him

7    to say, well, I don't know what they --

8          **THE COURT:**  Well, but I don't want to include people

9    in a class that don't want to be included.  I mean, frankly, we

10   already have Mr. Ackerman here as the Plaintiff.  There is a

11   motion for a class certification, which we do need to look

12   into, and I think that that's --

13         **MR. HAFTER:**  And it's easy --

14         **THE COURT:**  -- something that we probably will -- I'm

15   not going to rule on that today.  I am going to issue the

16   preliminary injunction as to Mr. Ackerman.  I want to set a

17   hearing for prior to the 21st though.

18         So do you all have your calendars with you?

19         **MR. HAFTER:**  Your Honor, first of all I've got to say

20   this.  For him to suggest, oh I don't know if there are other

21   people that have different needs, they take the kosher food

22   menu.  They've asked for the kosher food menu because they know

23   what it is and it's what they require.

24         I've already presented case law here from California

25   that suggested that under the same federal law Messianic Jews

1    are entitled to it.  The point is, is if you're getting kosher

2    food you should be able to retain that right.  And all you're

3    asking -- all that's going to happen is, is you're going to

4    create a substantial amount of work for my office --

5            **THE COURT:**  Well, I'm not saying that they're not --

6    that the other individuals aren't going to be able to obtain

7    the kosher food that's offered by the new menu.  I'm just

8    saying that Mr. Ackerman is the only one whose meals would be

9    enjoined and he would not be --

10           **MR. HAFTER:**  The problem is now --

11           **THE COURT:**  -- provided the new kosher menu.

12           **MR. HAFTER:**  -- they've got aggrieved -- all these

13   other people have to grieve it, and then they're going to take

14   their time in hearing the grievances, and then we're going to

15   have file new lawsuits.

16           **THE COURT:**  No, because until then I want to set a

17   hearing before the implementation on the 21st so that we can

18   look at how many other individuals would be in this class and

19   whether or not these are individuals who would require the --

20           **MR. GEDDES:**  Can we have that be an evidentiary

21   hearing --

22           **THE COURT:**  -- more Orthodox --

23           **MR. GEDDES:**  Just making arguments doesn't inform the

24   Court as much as hearing evidence.

25           **THE COURT:**  Possibly that would be the better way to

1    go.

2         Melissa, do you have something before the 21st?

3         **THE CLERK:**  I got the 14th.

4      **(Court confers with the Clerk)**

5         **THE COURT:**  How about Wednesday, February 15th, if

6    we --

7         **MR. HAFTER:**  I'm in San Francisco arguing before the

8    Ninth Circuit, your Honor.

9         **THE COURT:**  Oh, okay.

10        **MR. HAFTER:**  On Wednesday and Thursday.

11        **THE COURT:**  Wednesday and Thursday.

12        **MR. HAFTER:**  The following week I'm in New York and

13   New Orleans.  And quite honestly, your Honor, I'm trying to

14   understand what specifically -- what evidence would you be

15   looking to hear.  I mean do I need to go grab experts to

16   testify as to kosher food standards?  I mean right now there's

17   a kosher food policy that the prison has.

18        **THE COURT:**  My question is whether or not I can grant

19   a preliminary injunction to anyone other than Ackerman

20   when Ackerman is the only Plaintiff in the case.  We haven't

21   certified a class in the case, so how can I grant a preliminary

22   injunction to a class of individuals that hasn't even been

23   identified and certified as a class?

24        **MR. HAFTER:**  They've only made two objections to the

25   motion to certify.  One is because Ackerman received the

1   canteen items and one is because of this mysterious enemy

2   combative.  All right.  And as long as he's at Lovelock, which

3   they said that they have a right to keep him separate and move

4   him so that's -- there is no conflict there, all right.  And

5   presumably, the only thing Ackerman is asking for is to

6   maintain the status quo of the availability of kosher food for

7   all the inmates that are receiving kosher.  Who would have a

8   problem with that?

9           **MR. GEDDES:**  We do, your Honor, and I'll tell you

10  why.  We've heard testimony all morning about, well, they don't

11  count because they're of this tribe or of this level or they're

12  reformed --

13          **MR. HAFTER:**  No, we never said that, your Honor.

14          **MR. GEDDES:**  You did.  You said that this person's

15  opinion doesn't count, this person is reformed.

16          **MR. HAFTER:**  As an expert.

17          **MR. GEDDES:**  That implies that there are different

18  needs.  And I think this Court under the PLRA has to restrict

19  its scope of relief on an informed basis to the needs that are

20  presented.  And I think that warrants having an evidentiary

21  hearing to hear whether or not Messianics or are there reformed

22  rabbis, are there -- we don't know that.  And all we're hearing

23  today is argument and all we're asking for is an evidentiary

24  hearing where the Court can gather evidence.

25          **MR. HAFTER:**  Your Honor, what he's asking to do is

1  bring every rabbi in here and argue about the standards of

2  kosher food.

3          **MR. GEDDES:**  No, I'm --

4          **MR. HAFTER:**  That's not the issue.  The issue is, is

5  whether or not somebody who is getting kosher food now is

6  entitled to continue to receive that under an equal rights and

7  First Amendment issue.  The fact of the matter is if they're

8  not happy with the current kosher menu because it doesn't meet

9  their needs, they would have brought an action just like we're

10  bringing to challenge the common fare menu against the current

11  kosher menu.  That's not the issue here.

12          **MR. GEDDES:**  The issue, as has been stated many

13  times --

14          **THE COURT:**  Okay.  There's two different motions.

15  The one motion is the motion for preliminary injunction that

16  Mr. Ackerman has raised, and I am granting that.  The other

17  motion is the motion for class certification, and that motion

18  we are not going to be making a ruling on today.  I think I do

19  want more information as to that.  So I want to set a hearing

20  for the motion for class certification so that we can have --

21          **MR. HAFTER:**  So the issue is only class

22  certification, right, your Honor?

23          **THE COURT:**  Right.

24          **MR. GEDDES:**  Well, your Honor --

25          **MR. HAFTER:**  And what are you specifically asking us

1    to present at that hearing so we could prepare for that

2    properly?

3            **THE COURT:**  Well, for example, you've already briefed

4    for me today that if there was a class certified, that the

5    individuals who would be able to be identified as appropriate

6    members of those class would not have to go through the

7    grievance procedure themselves.  So, you know, for example,

8    that would be something that --

9            **MR. HAFTER:**  That's not an evidentiary hearing;

10   that's a legal argument.

11           **THE COURT:**  No, right.  And because I think there is

12   still a --

13           **MR. GEDDES:**  The scope of relief needs to be

14   determined, your Honor, and you need to base that on evidence.

15   We are told that the reason why the CFM doesn't work -- we were

16   told that today -- is because there's no ongoing supervision by

17   a rabbinical authority.  There's been no evidence that anyone

18   who would like the kosher meal requires that.  There are the

19   Messianics, there are others, that's what we're saying.  And so

20   in order to scope -- to provide the scope of relief to its

21   appropriate measure, the Court has to receive evidence as is --

22   what we're hearing, it's kosher, it's kosher; that's not true.

23   The reason why this Court is ruling that this is not kosher is

24   for two very specific reasons.  Ongoing supervision --

25           **THE COURT:**  Well, there are some people who have

1   moved to intervene.  And I don't know how many other people

2   would want to be -- how many other inmates would want to be

3   included in this preliminary injunction.  Maybe they don't.

4   Maybe they'd like the new menu.  Maybe they think it's going to

5   be better than the one they have now.  I don't know if

6   everybody is as concerned as Mr. Ackerman about whether or

7   not --

8          **MR. GEDDES:**  That's our point.

9          **THE COURT:**  -- there is the rabbinic supervision --

10         **MR. HAFTER:**  But we don't have access to --

11         **MR. GEDDES:**  Whether there's the need.

12         **MR. HAFTER:**  -- the inmates, your Honor.  I mean I

13  can't -- we can't -- I don't even know who the enemy is that I

14  can -- we can't ask him.  We could bring him in and say:  Would

15  you have a problem with us fighting this based on the briefs

16  and the pleadings that we've put in -- would you have a problem

17  with us fighting on your behalf as a member of the class?  But

18  I can't even do that.  I can't even present that evidence

19  because I don't know who it is.

20         **THE COURT:**  Well, does the Department keep statistics

21  about -- I'm sure they have to --

22         **MR. SPEAKER:**  Absolutely.  We know who's having a

23  kosher meal.

24         **THE COURT:**  -- of who is certified and who is not,

25  who is having a kosher meal and who is not --

1          **MS. ROSENBERG:**  We can't do that for --

2          **THE COURT:**  -- and based on what information?  Can't

3     do what, can't keep the information?

4          **MS. ROSENBERG:**  We don't know who's a -- who

5     specifically -- we can't ask those questions.

6          **THE COURT:**  Okay.

7          **MR. SPEAKER:**  But your Honor --

8          **THE COURT:**  But you know who is --

9          **MR. SPEAKER:**  Well, no, it's --

10         **THE COURT:**  -- and who's not receiving the kosher

11    meal.

12         **MR. SPEAKER:**  Right.  We --

13         **MS. ROSENBERG:**  Oh, we do, absolutely.  Absolutely.

14         **MR. SPEAKER:**  That's what we're saying.

15         **MR. HAFTER:**  And I think that they could easily

16    provide those people with a questionnaire saying do you want to

17    be members of the class?  And I think it would be fair if

18    they -- if they answer in the affirmative on a questionnaire,

19    they should be entitled to the preliminary injunction as well.

20         **MR. GEDDES:**  Your Honor, the reason why this goes

21    back to the scope is there's more than one kosher.  And I think

22    the Court's concern --

23         **MR. HAFTER:**  There's not.  There's one kosher meal in

24    the prisons.  That's it.

25         **MR. GEDDES:**  We have testimony already on the record

1    from a person who they call a reformer.  He is a rabbi in

2    California.  We are entitled to know whether the scope of

3    relief for Mr. Ackerman's needs is the same for all.  Now, he's

4    saying kosher is kosher.  That's not true.  The reason why this

5    Court is looking at serious needs is on the two issues he's

6    identified on the record before this Court, continuous

7    supervision and certification.

8           We know that there are reformed rabbis.  There are

9    different diets; there are different needs.  And it's not

10   appropriate under the PLRA to say one size fits all at

11   $1.5 million potential extra costs to the state of Nevada.

12   That's just not right and we don't have the evidence.

13          **MR. HAFTER:**  First of all, we don't know if

14   1.5 million --

15          **THE COURT:**  Do you have a position -- Mr. Geddes, do

16   you have a position as to whether this would be an opt in or an

17   opt out class?

18          **MR. GEDDES:**  I don't.  I would have to brief it, your

19   Honor.

20          **MR. HAFTER:**  Your Honor, we don't know that 1.5 is

21   correct.

22          **MR. GEDDES:**  I have evidence before the Court; it's

23   projected.  If you have evidence --

24          **MR. HAFTER:**  No, you have preclusionary statements.

25   And we haven't had a chance to investigate --

1          **THE COURT:**  I don't have a doubt there's a cost

2   statement.  And it really doesn't matter --

3          **MR. HAFTER:**  There is a cost statement but --

4          **THE COURT:**  -- if it's 1.2 or 1.5.  But that's okay;

5   we're not going to go there.

6          **MR. HAFTER:**  But many courts have said that the cost

7   statement isn't enough.  And the fact of the matter is we're

8   not talking implementing a new program.  We're talking about

9   with the preliminary injunction maintaining the status quo.

10  The status quo is the one kosher menu that they're currently

11  using, they've been using for the last God knows how many

12  years.  And I think, if anything, the only thing that would be

13  appropriate for this Court to query is the people who are

14  currently receiving the kosher meal, do they want to continue

15  to receive it under their religious beliefs.  And if they

16  answer yes under oath to that question, then they should be

17  included in this.

18         **MR. GEDDES:**  Your Honor, we're hearing a lot of

19  avoidance --

20         **THE COURT:**  Okay, well.

21         **MR. GEDDES:**  -- to evidence.  All we're asking for is

22  evidence.

23         **THE COURT:**  Okay.  Today is the 9th or the 10th?

24  What is today's date?

25         **MR. HAFTER:**  The tenth, your Honor.

1        **THE COURT:**  The tenth.  Okay.  Today is the 10th, and

2   the implementation is scheduled for the 21st.  So here's what

3   I'm going to do.  I'm going to go ahead and grant the

4   preliminary injunction as to Mr. Ackerman.  And then as to the

5   rest of the individuals who are receiving a kosher meal I am

6   asking Mr. Geddes -- or Mr. Geddes to plead provide to them a

7   letter indicating that the Court is providing them a choice as

8   to whether or not they want to be included in the preliminary

9   injunction.  And then they can indicate whether or not they

10  want to.  Some people may not want to.  Some people may want

11  to.  I don't feel comfortable making that decision for them.

12       **MR. GEDDES:**  Your Honor --

13       **THE COURT:**  And if we can have that before, I guess

14  February 20th, since the implementation is on the 21st.  And

15  you can just file it.  And you know, you can make it so that if

16  they don't respond by a certain date, then they don't get to

17  opt in.  And then that will just be for the purpose of the

18  preliminary injunction now.

19       For purpose of class certification, that's still

20  alive and still can be addressed on a different day.  This is

21  just for the immediate injunction.

22       **MR. HAFTER:**  And so from my understanding, what

23  you're insinuating is that we won't have to come back.  We'll

24  just simply include those members who opted in the affirmative.

25       **THE COURT:**  Right.  He'll just file with me an

1   indication of which individuals have said yes we want to be

2   included, and then those names will also be added to the order.

3   I'm trying to make it as simple as I can for you all.

4          **MR. GEDDES:**  Can I make sure I understand what the

5   Court is saying?

6          **THE COURT:**  Sure.

7          **MR. GEDDES:**  The Court is saying you want us to give

8   notice to the current members who are receiving kosher meals

9   saying would you like to opt --

10         **THE COURT:**  You can give it to them at their very

11  next meal.  By the way, here's an order from the Court that

12  says there's been an injunction.  There's a new meal -- you all

13  know there's a new meal, because you all know there's a new

14  meal coming.  Then the Court is ordering an injunction as to

15  the one person who raised this issue.  If you also want to be

16  included in that injunction and not receive the new meals --

17         **MR. GEDDES:**  Your Honor, we object to that.  We are

18  becoming an advocate for the Plaintiff.  If Plaintiff wants to

19  survey who his class is, it shouldn't be incumbent on the

20  Defendant, an adversarial party, to invite members to his

21  lawsuit.

22         And the other question is, is there not going to be

23  any evidence here?

24         **THE COURT:**  Well, that's what happens when you raise

25  a class action.  Do you want him to draft the letter?

1        **MR. GEDDES:**  It's these are his clients.  He's asking

2   me to create more liability from our client.

3        **THE COURT:**  Okay.  How about if I draft the letter

4   and then I will file it and then you can give it to the inmates

5   with their next kosher meal, and they can indicate on that form

6   whether or not they want to be included in the injunction.  If

7   they do, I'll add their name to the order; and if not, then I

8   won't.

9        **MR. GEDDES:**  And then what happens to the upwards of

10  500 and something inmates who are projected to join along the

11  way?  This is really going to be exactly what we talked about

12  and these are going to be --

13       **MR. HAFTER:**  Your Honor, that's speculation.

14       **MR. GEDDES:**  Excuse me, I'm not finished.  This is

15  going to be the parade or horribles that we've demonstrated

16  through evidence, and we have no expert testimony, no one

17  qualified in the rabbinic field to distinguish between the

18  degrees of kosher and whether this is something that --

19       **THE COURT:**  Are you telling me that the common fare

20  menu is so horrible that every other inmate is going to decide

21  to become an Orthodox Jew in order to be able to retain the old

22  menu?

23       **MR. GEDDES:**  I can comfortably say to this Court

24  that -- and I've said it before already -- the one thing the

25  prisoners want is what someone else doesn't have.

1          **THE COURT:**  Because I'll tell you.  With all due

2  respect, I like bacon, I like cheese on my cheeseburger.  If

3  I'm an inmate, I'm not necessarily going to go kosher just

4  because of this.

5          **MR. GEDDES:**  Your Honor, the inmates obviously are

6  going to have a perception that this costs a lot more money and

7  they're going to want that.  I believe that in fairness and

8  under the PLRA we have to have a hearing on the needs of

9  various religious organizations that require different degrees

10  of kosher.  I do not believe that Mr. Hafter will stand up

11  before this Court and say that a liberal or reformed Jewish

12  person has the exact same religious requirements.  I spoke with

13  a rabbi --

14          **MR. HAFTER:**  But it doesn't it --

15          **MR. GEDDES:**  -- who was reformed.  I'm almost

16  through.  I spoke with a rabbi, and she has a much different

17  diet than an Orthodox.  And so the current kosher meal is one

18  that is a restrictive and costly kosher meal.  The common fare

19  menu satisfies that.  And we have to receive evidence as to

20  whether Messianics or others require the element of ongoing

21  continuous supervision through a rabbinical authority.  That is

22  the sole basis of the Court granting the injunction.

23          **THE COURT:**  Okay.  Well, if you have to have that

24  evidence, then why don't you put off the implementation until

25  we have that evidence.  But you don't want to do that.

1        **MR. GEDDES:**  I can contact my client to see if it

2  will delay it a week or two.  We would like to schedule an

3  expert hearing on this.  I really believe we're being --

4        **THE COURT:**  I will schedule an expert hearing if you

5  would delay the implementation order for us to be able to have

6  that evidentiary hearing.

7        **MR. GEDDES:**  How much time do we need to delay it?  I

8  will present this to my client.

9        **MR. HAFTER:**  Your Honor, in order for us to present

10  an expert we need to have unfettered access to inspect their

11  facilities.

12        **THE COURT:**  I think you all are going to have to

13  conduct some actual --

14        **MR. HAFTER:**  We need discovery.

15        **THE COURT:**  -- discovery.

16        **MR. HAFTER:**  Absolutely.  We can't just rush into --

17  and so I think what the difference is, this parade of horribles

18  that he's saying is going to happen, forgets the fact that you

19  said it's limited to the people who are currently receiving a

20  kosher meal.  We're fine with that.

21        **MR. GEDDES:**  Just one second.

22        **(Voices heard off the record)**

23        **MS. ROSENBERG:**  Two hundred and ninety-three.

24        **MR. GEDDES:**  Two hundred and ninety-three inmates,

25  your Honor.  And I can guarantee you, because I'm working on

1     some of those cases, they are not all Orthodox Jews.  We are

2     simply providing an overbroad relief, which violates the <u>Prison</u>

3     <u>Litigation Reform Act</u>.  I'm sorry opposing counsel is not

4     available next week.  This is an important case for the state

5     of Nevada.

6           We will accommodate the Court if the Court would like

7     to push us back a few weeks.  I can represent that to my

8     client; I can recommend, I'm sorry.  I would like to get some

9     experts.  I would like this Court to have an informed opinion

10    as to what the needs, how they vary from the kosher.  It is not

11    fair to take opposing counsel's specialized knowledge, which is

12    not factual knowledge; it's specialized knowledge.  And there

13    needs to be sworn witnesses who can be cross examined and the

14    Court can attach the correct weight of authority to that

15    opinion.  That's not what's happened here.  We have someone who

16    outmatches me on ecclesiastical issues, and it's simply not

17    fair.

18          **MR. HAFTER:**  Your Honor, they've said that the

19    standard that they're trying to implement is the Orthodox

20    Union.  Bring in a representative of the Orthodox Union --

21          **MR. GEDDES:**  We'll bring them --

22          **MR. HAFTER:**  -- and it will satisfy it.  We'll gladly

23    provide a representative from the Orthodox Union to --

24          **THE COURT:**  Okay, time out.

25          **MR. HAFTER:**  -- address supervision.

1          **THE COURT:**  Time out, time out.  Okay.  We're done.

2     I am issuing the preliminary injunction as to Mr. Ackerman.  I

3     will formulate an order or a letter that will be filed that

4     then Mr. Geddes can go ahead and provide to the prison, to go

5     ahead and provide to all the inmates that receive -- the two

6     hundred and some inmates that receive their kosher meal.  And

7     they can decide whether or not they want to opt in for the

8     purposes of preliminary injunction.  This has nothing to do

9     with the class, just preliminary injunction.  And then we'll

10    come back here and have a hearing.  And it's up to you if your

11    client wants to go ahead and rather than go through all the

12    trouble if they want to just hold off on implementing the plan.

13         **MR. GEDDES:**  That's what I need clarification if I

14    may from the Court, a couple of things.

15         **THE COURT:**  That would be the alternative that I

16    think would be very reasonable if you want to put it off.

17         **MR. GEDDES:**  In lieu of granting the injunction is

18    the Court offering an alternate relief that will suspend that

19    ruling --

20         **THE COURT:**  Yes.

21         **MR. GEDDES:**  -- in light of a stay of advancement for

22    a reasonable amount of time so we can put on an evidentiary

23    hearing?

24         **THE COURT:**  So we can have a hearing, yes.

25         **MR. GEDDES:**  Okay.

1          **THE COURT:**  But I want to have actual discovery

2    before we can have the hearing.  So we're talking at least 60,

3    90 days.

4          **MR. HAFTER:**  What's the problem with having an

5    injunction in place if they're delaying the implementation?

6    They can always move to lift the injunction once we have done

7    that --

8          **MR. GEDDES:**  The other question I had, your Honor, is

9    would this Court certify this for an interlocutory appeal?

10          **THE COURT:**  I think I would once I issue an order,

11    but I don't think we've gotten to the point where I've issued

12    an order yet that I think is --

13          **MR. GEDDES:**  And so --

14          **THE COURT:**  -- sufficient for the -- the point of the

15    appealability is I have to provide an order and the information

16    sufficiently so they can actually review it.  So there needs to

17    be something for them to be able to review it.  At this point

18    we're still kind of up in the air as to whether or not you're

19    going to be delaying the implementation or whether --

20          **MR. GEDDES:**  And you can set a deadline for us to

21    notify the Court.  We're happy to do that.  We would like that

22    clarification.

23          **THE COURT:**  That would probably be the best way.

24          **MR. HAFTER:**  So let me ask you something, your Honor.

25    If they say we're going to delay it for 60 days, are we going

1    to be back here doing this again in 60 days?

2            **MR. GEDDES:**  Hopefully, we'll have an evidentiary

3    hearing.

4            **THE COURT:**  Well, what I would prefer is for you all

5    to get a discovery scheduling order in place and have an

6    evidentiary --

7            **MR. HAFTER:**  Which the motion to dismiss isn't

8    granted --

9            **THE COURT:**  Discovery for -- no, we have a lot of

10   cases where we don't rule on the motion to dismiss right away

11   and discovery begins, because often times it's helpful to

12   supplement the motions after you do some discovery.

13           So, I'm sorry, Melissa.  I think that you started

14   giving me dates and then -- so go out 60 days.  Let's see if we

15   can -- so some time in April.

16           **MR. GEDDES:**  And, your Honor, may we -- so that I can

17   take back to my client clarification from the Court, obviously

18   my client is going to have to evaluate a cost benefit analysis

19   to see what is in its best interest and the interest of the

20   state.

21           Is it this Court's order, can it be this Court's

22   order, we would request that the only people that if this

23   Court -- if the option that's selected is a limited injunction

24   rather than a stay of time to implement the common fare without

25   the pronouncement from this Court, which we believe will be a

1    formal statement that there is an injunction, that only those

2    members who as of today are receiving current menus are

3    eligible for the Court's order, that there cannot be this

4    bandwagon effect where new people are going, "Hey, did you hear

5    what happened?  Let's sign up, let's sign up."

6            There are -- how many did you say?

7        **MS. ROSENBERG:**  Two ninety-three.

8        **MR. GEDDES:**  Two hundred and ninety-three.  The

9    projection for 2013 goes up over 500.  I think that if we --

10       **THE COURT:**  Well, I don't think we can limit it under

11   the spirit of (indiscernible) because if anyone does convert,

12   or if anyone new is admitted into prison who wants to also

13   participate, I can't see how they wouldn't be included under my

14   lupa, under my reading.

15       **MR. HAFTER:**  Conversely, your Honor, I'd be fine with

16   stipulating to limit it to not just those who are currently

17   receiving it, but anyone who has an application in today to

18   receive it because I think that's a fair breaking point.

19       **MR. GEDDES:**  This relief is over-broad.  Not

20   everyone, including the Messionics, are going to insist upon or

21   require -- and they may insist upon it because they perceive

22   there's more value in it but there could be evidence to show

23   it's not required.  And we haven't even had evidence before

24   this Court to show that the Orthodox standard or Mr. Ackerman's

25   standard is required.  All we have is we have talk and

1   argument, and this is the reason why I filed my motion saying,

2   is evidence going to be received, are we going to have experts

3   because we have a lot to say on this.  And under PRLA, the

4   relief is extremely over-broad.

5         **THE COURT:**  Well, I don't think it's over-broad when

6   the original request was to enjoin the entire implementation as

7   to everyone, and so I'm down to the point where I'm only

8   enjoining it as to Mr. Ackerman, and then only providing

9   letters to the individuals who are currently receiving the

10  kosher meals, so I'm trying to limit it as much as possible.  I

11  don't think it's over-broad.

12        **MR. GEDDES:**  Can we request further hearing then

13  before this Court then expands it to other people?

14        **THE COURT:**  You can always file a Motion to Modify a

15  Preliminary Injunction.

16        **MR. GEDDES:**  Well, I'm requesting an Evidentiary

17  Hearing is what I would do.

18        **THE COURT:**  And that's what I'm trying to see.  If we

19  can't get a date, we can do that.

20        **MR. GEDDES:**  I'm not asking for an Evidentiary

21  Hearing at the end of Discovery because that's basically a

22  trial.  I'm asking for an Evidentiary to prevent undue hardship

23  on the State of Nevada.

24        **MR. HAFTER:**  Your Honor, that goes to the ultimate

25  merits of the case.  I mean. there are --

1        **MR. GEDDES:**  It goes to the scope of relief, under

2    the PLRA which you haven't even addressed in your briefs.

3        **THE COURT:**  Okay, enough, please?  Both of you sit

4    down and just be quiet for a second so I can look at the

5    calendar.

6        **MR. GEDDES:**  Thank you, your Honor.

7      **(Pause)**

8        **THE COURT:**  How about April 4th?  That's a Wednesday.

9        **MR. HAFTER:**  Your Honor, what testimony are we

10   providing, because if you're going to ask me --

11       **THE COURT:**  This would just be a motion on a hearing

12   for the certification of class.

13       **MR. HAFTER:**  Okay, because if you're going to ask me

14   to provide any Rabbinic source, I can tell you there's no way

15   because that's a day and a half before Passover --

16       **THE COURT:**  Oh.

17       **MR. HAFTER:**  And so there's no way I'm going to be

18   able to get any Rabbinic experts here to testify, but I don't

19   think a Rabbinic expert is necessary for certification in

20   class, is it?

21       **MR. GEDDES:**  Your Honor, it absolutely is.

22       **THE COURT:**  It depends on the argument which I now

23   think is going to be, or has turned into whether not the class

24   includes only the Orthodox, or whether it includes all other

25   Jewish inmates.  If I'm hearing Mr. Geddes right, that seems to

124

1    be, perhaps, the --

2         **MR. HAFTER:** Your Honor, I don't even know how to --

3    I don't even know how to address that. You've got a population

4    of people who are obtaining kosher food now. I mean, they've

5    met whatever burdens there are.

6         **THE COURT:** I don't think it's a factual question; I

7    think it's a legal question, and if you look at -- into Class

8    Certification you might be able to determine whether or not the

9    -- the certification of the class, whether that's something --

10        **MR. HAFTER:** I agree, and that's why I'm just --

11        **THE COURT:** -- the parameters of which you could give

12   the Court some clarification as to how much leeway and

13   discretion I have.

14        **MR. GEDDES:** Thank you, your Honor. May we add

15   briefing to that Certification Class. We would welcome that

16   opportunity.

17        **THE COURT:** Yes. In fact, I think that was one of

18   the motions that actually was completely briefed, so I think we

19   should probably have --

20        **MR. GEDDES:** We request further briefing based on the

21   developments in this hearing, your Honor.

22        **THE COURT:** Yeah, I think that's a good idea because

23   this is something new that's come up that wasn't already

24   briefed and --

25        **MR. HAFTER:** We would ask that they take the first

 1   shot at a brief because I'm not really sure.  Besides the

 2   exhaustion issue on PRLA first, for new class members, and the

 3   issue of opt in, opt out, I'm not sure what else is the issue

 4   so --

 5            **THE COURT:**  Okay, so Passover is April 6th to April

 6   14th?

 7            **MR. HAFTER:**  It starts that Friday, yeah.

 8            **THE COURT:**  Okay. So how about the 18th, April 18th?

 9   Is that a Wednesday, too?

10            **THE CLERK:**  Yes, your Honor.

11            **THE COURT:**  Okay, Wednesday, April 18th?

12            **MR. HAFTER:**  Okay.

13            **THE COURT:**  How does that sound?

14            **MR. GEDDES:**  Your Honor, if it means we go first, we

15   get the reply brief, we're happy to do that.  And just so that

16   you know, your Honor, this is a hearing where we can present

17   experts, is that correct?

18            **THE COURT:**  Yes, I'm -- I'm blocking off the entire

19   day.

20            **MR. HAFTER:**  Well, that's my question, your Honor.

21            **THE COURT:**  Well, that's the --

22            **MR. HAFTER:**  Is it a legal issue?'

23            **THE COURT:**  It's the Plaintiff's Motion for Class

24   Certification, so I think that the Plaintiff should go first,

25   and also get the Reply.

1        **MR. HAFTER:**  What issues would you like us to brief

2   here?

3        **THE COURT:**  If I were, of course, whether or not I

4   should certify the class based on the new information that we

5   know now, and if I was to certify the class, who would be

6   included in that class?  Who would receive the notification?

7   And then whether it would be an opt in or an opt out.  That's

8   just off the top of my head.  I'm not saying that that's all --

9   you-all have a way of bringing issues in that no one ever

10  considered, so I'm --

11       **MR. HAFTER:**  Isn't that what was already in our

12  Motion?

13       **MR. GEDDES:**  Your Honor, could we also brief the

14  issue as to whether or not the relief of the -- any injunctive

15  relief of a common -- of the kosher meal is required for

16  certain members who may have a lesser standard, and that's what

17  we want expert testimony on.

18       **THE COURT:**  Well, that would be part of whether --

19       **MR. GEDDES:**  Thank you.

20       **THE COURT:**  -- the definition of the class, wouldn't

21  it?

22       **MR. GEDDES:**  Thank you.

23       **THE COURT:**  I'm assuming.  Now it's very clear.  You

24  will be arguing only the Orthodox Jewish inmates should be

25  included.

1    **MR. GEDDES:**  Well, in order to --

2    **THE COURT:**  Well, but in the alternative, if there

3    were to be one, but it would be only as to those people.

4    **MR. GEDDES:**  In order for that we need Discovery,

5    your Honor, and we need to know every prisoner who is currently

6    receiving kosher food.  We need all their applications that

7    they made to obtain that because there is an application

8    process.  We need to be able to have unfettered access to those

9    individuals.  I should be able to have arrangements and that

10   way any and all of them, all 293 can testify on April 18th?

11   **THE COURT:**  Judge Leen will be able to take care of

12   all of those requests.  Those are all discovery issues --

13   **MR. GEDDES:**  Is this going to be heard before Judge

14   Leen?

15   **THE COURT:**  I'm sorry?

16   **MR. GEDDES:**  Is this going to be heard before Judge

17   Leen.

18   **THE COURT:**  I believe -- yes.  It a PAL case, right?

19   Is it GMN-PAL?

20   **MR. GEDDES:**  Yes.

21   **THE COURT:**  Yeah, so that's Judge Leen.

22   **MR. HAFTER:**  But, your Honor, my problem is if I've

23   got 60 days to put all this together, and we start arguing over

24   formal discovery requests, and when discovery started --

25   **MR. GEDDES:**  It's litigation.

1          **THE COURT:**  Well, I'm still --

2          **MR. HAFTER:**  That's right, it's litigation.

3          **THE COURT:**  I'm still -- just a minute.  I'm still

4    granting the motion for the preliminary injunction as to

5    Mr. Ackerman, and I'm still drafting the letter, and it's going

6    to be provided to everyone receiving a kosher meal, and they

7    can decide whether or not to be part of the Order.  That's

8    still in effect unless the Department decides that it's in

9    their best interests to just defer the implementation

10   altogether.  That will be their administrative choice to make.

11         But -- so that's -- so essentially, anyone who wants

12   to be included will be included.  At least that's my intent

13   with my Order.  I might be missing something but that's my

14   intent.

15         **MR. GEDDES:**  Of the current --

16         **MR. HAFTER:**  And then, in essence, all I have to --

17   all we are required --

18         **THE COURT:**  But that doesn't mean that part of the --

19   of the class, or the class action certification, which brings

20   up other issues.

21         **MR. GEDDES:**  Your Honor, is the Court limiting it or

22   not limiting it?  Is it anyone who wants to join on the

23   bandwagon can join on the bandwagon?

24         **THE COURT:**  No.  This letter is only being provided

25   to the individuals that are currently receiving the kosher

1  meals.  That's what Mr. Hafter just said he would be willing to

2  go ahead and allow that limitations so that you don't --

3       **MR. GEDDES:**  Is it Orthodox Jews, or is it anyone --

4  Messionics --

5       **THE COURT:**  Anyone currently receiving the kosher

6  menu.

7       **MR. GEDDES:**  Okay.

8       And so the Evidentiary Hearing on this is April 18th,

9  is that the date that's been picked?

10       **THE COURT:**  April 18th, 9:00 a.m. -- Melissa?

11       **THE CLERK:**  Yes.

12       **THE COURT:**  9:00 a.m., April 18th.

13       You all can, of course, agree to stipulate to change

14  that date if -- if there's some resolution, or if there's some

15  further discovery that you want to do, but you can take that up

16  with Judge Leen, I'm sure she'll --

17       **MR. GEDDES:**  Okay, so if we send the letters out, and

18  February 21st comes by, we just -- we crank out the CFM with

19  the exception of those who are on the letter.

20       **THE COURT:**  Correct.

21       **MR. GEDDES:**  So that during the 60-day period we'll

22  have two lines of operation with respect to kosher meals, those

23  who --

24       **THE COURT:**  My Order today will be as to Mr. Ackerman

25  only with the caveat that the letter is to be provided to the

1    other individuals receiving the kosher meal.

2              If anyone decides that they want to be included, then

3    I'll just amend my Order to add their name.

4         **MR. GEDDES:**  And where are they sending the

5    information if they want it?  Do they send it back to the

6    Court?

7         **THE COURT:**  No, you're sending it.  You're going to

8    be filing it.

9         **MR. GEDDES:**  Okay.  And so -- but until the Court

10   pronounces, it could be this process where its gathered and

11   sent back to the Court, but the Court will pronounce -- take

12   them off the common fare and give them the current kosher menu.

13   It's not something we have to be ambivalent or guess about, is

14   that correct?

15        **THE COURT:**  Right.  You're going to be filing, before

16   February 20th, with the Court the list of individuals who

17   received that letter and decided that they wanted to be

18   included in the injunction.

19        **MR. GEDDES:**  Your Honor, could we --

20        **THE COURT:**  And then I'll issue the menu order and

21   just add those names to the list --

22        **MR. HAFTER:**  Okay.  So it's not something ongoing

23   past the 20th?

24        **THE COURT:**  So right now the Order is only going to

25   have one name, Mr. Ackerman.  You're -- I'm going to draft the

1    letter.  You're going to provide it with the meals to everyone

2    that provides the kosher meals.  They're going to either opt in

3    or throw it away or do whatever --

4         **MR. GEDDES:**  So they have till February 20th and then

5    that's it?

6         **THE COURT:**  Well, you decide what date,

7    administratively, you need to have that back.  You need to file

8    it.  Your requirement is to file it with the Court before the

9    20th so that I can file the Amended Order before the 21st.

10        **MR. GEDDES:**  So if we file it on the 19th and gather

11   up all the names we've gotten back --

12        **MR. HAFTER:**  Your Honor, the 19th --

13        **THE COURT:**  Maybe you give these people one day, you

14   can give them two weeks -- I don't know how long you're going

15   to give them to get back to you.  I mean, they can -- they can

16   decide to be --

17        **MR. HAFTER:**  Your Honor, the 19th is a Sunday and the

18   20th is a legal holiday that this Court's closed on for

19   Washington's Day -- Washington's birthday.

20        But I would like to ask, as an aside, that your Order

21   also includes that --

22        **THE COURT:**  But you filed something at 3:00 a.m. this

23   morning.  You can electronically file everything.

24        **MR. HAFTER:**  I would consider it for you, your Honor.

25        **THE COURT:**  Well, I'm on line all the time.  I

1  receive everything that's filed on that.  Just like you get the

2  notifications of electronic filing (indiscernible), I get them,

3  too, on every single case that I have.

4         MR. HAFTER:  I guess I was being presumptive that

5  you're not up at 3:00 a.m.

6         THE COURT:  Well, I appreciate you calling that to my

7  attention.  I did forget about the holiday.

8         MR. HAFTER:  Your Honor, I would like to ask if the

9  Order also includes the requirement that we get a actual

10  photocopy of all responses that are provided, out of fairness.

11         MR. GEDDES:  You'll get it when it's filed.  We're

12  going to forward the documents to the Court and you'll get a

13  copy of that in an Efile.

14         THE COURT:  Okay.

15         MR. HAFTER:  Oh, so you're going to file the

16  actual --

17         MR. GEDDES:  I will file them.  I don't want to be

18  responsible for interpreting what they're saying.

19         MR. HAFTER:  Well, that was my concern.  I appreciate

20  that, Mr. Geddes.

21         MR. GEDDES:  So, your Honor, we're not to --

22         THE COURT:  If you could at least divide out which

23  ones said "yes" and which ones said "no" so it's easier for my

24  staff to count them up, and then you could go ahead and file

25  them just as two separate filings.

1          **MR. GEDDES:**  And when do we get to weigh in on what

2    option we want?

3          **THE COURT:**  You choose whatever option you want.

4    It's -- it's --

5          **MR. GEDDES:**  Can you set a deadline for that so that

6    we --

7          **THE COURT:**  Well, the implementation date is the

8    21st.  You either implement it or you don't.  If you do

9    implement it, you have to implement it with the conditions that

10   Mr. Ackerman and anybody else on that list on the Amended

11   Order, are not to receive it.  But if you don't want to

12   implement it you don't have to.

13         **MR. GEDDES:**  But once you issue an Order you'd would

14   be willing to certify that, if we wanted to have an

15   interlocutory appeal?

16         **THE COURT:**  Yes.

17         **MR. GEDDES:**  Okay, thank you.

18         **THE COURT:**  Okay.  So the next hearing is April 18th,

19   2012 at 9:00 a.m.

20         Any other clarification or anything else?

21         No?  All right.

22         **MR. HAFTER:**  No.  Thank you, your Honor.

23         **MR. GEDDES:**  Thank you, your Honor.

24         **THE COURT:**  So I'll go ahead and get this done today

25   so that you have that and you can get started.

1          **THE CLERK:**  All rise.

2          **THE COURT:**  Thank you.

3          **MR. HAFTER:**  Thank you.

4      **(This proceeding was adjourned at 1:16 p.m.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    <u>March 15, 2012</u>

            Signed                                          Dated


                *TONI HUDSON, TRANSCRIBER*